[No. H035370. Sixth Dist. Apr. 13, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT CHRISTOPHER BRUNETTE, Defendant and Appellant.

## COUNSEL

Alfons G. Wagner, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Sharon G. Birenbaum, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**DUFFY, J.**—A jury convicted Robert Christopher Brunette, the defendant herein, of animal cruelty and neglect. The trial court ordered him to pay a large restitution amount to the animal welfare agency that had to arrange care for the dogs it rescued. This appeal requires us to consider whether the trial court erred in not reducing the award to account for the agency's putative comparative negligence in not abating the condition sooner, and abused its discretion by not setting off revenues the agency may have received from adopting out some of the dogs.

We will affirm the judgment except for the trial court's imposition of an interest charge on the restitution award.

### PROCEDURAL BACKGROUND

A jury convicted defendant of two felony counts of animal cruelty (Pen. Code, § 597, subd. (b)),[1] four misdemeanor counts of providing unfit animal

---

[1] All statutory references are to the Penal Code except as otherwise indicated. Section 597, subdivision (b), provides: "Except as otherwise provided in subdivision (a) or (c), every person who overdrives, overloads, drives when overloaded, overworks, tortures, torments, deprives of

living conditions (§ 597t), and three misdemeanor counts of animal neglect (§ 597.1, subd. (a)), following which the trial court convicted him of two violations of Santa Cruz County animal ordinances, offenses that constituted infractions. The court sentenced defendant to a year in county jail on the misdemeanors and five years' formal probation on the felonies. Following a restitution hearing, the court ordered defendant to pay animal care restitution (see §§ 597, subd. (f)(1), 597.1, subd. (k)) of $127,331.33 to the Santa Cruz County Animal Services Authority and declined to reduce the award on comparative fault principles or by amounts listed on an adoption fee schedule. The restitution award forms the subject of this appeal.

## FACTS

This macabre case involves appalling animal cruelty. There are parallels between aspects of it and Joseph Conrad's novella Heart of Darkness: cruelty, the abandonment of civilized norms, and apparent madness; remote locations that discouraged outside investigation; and arranged displays of severed heads.

### I. *Prosecution Case*

In 2008, responding to a neighbor's complaint, Santa Cruz County Animal Services Authority (Animal Services Authority) employees and sheriff's

necessary sustenance, drink, or shelter, cruelly beats, mutilates, or cruelly kills any animal, or causes or procures any animal to be so overdriven, overloaded, driven when overloaded, overworked, tortured, tormented, deprived of necessary sustenance, drink, shelter, or to be cruelly beaten, mutilated, or cruelly killed; and whoever, having the charge or custody of any animal, either as owner or otherwise, subjects any animal to needless suffering, or inflicts unnecessary cruelty upon the animal, or in any manner abuses any animal, or fails to provide the animal with proper food, drink, or shelter or protection from the weather, or who drives, rides, or otherwise uses the animal when unfit for labor, is, for every such offense, guilty of a crime punishable as a misdemeanor or as a felony or alternatively punishable as a misdemeanor or a felony and by a fine of not more than twenty thousand dollars ($20,000)."

Section 597t provides:

"Every person who keeps an animal confined in an enclosed area shall provide it with an adequate exercise area. If the animal is restricted by a leash, rope, or chain, the leash, rope, or chain shall be affixed in such a manner that it will prevent the animal from becoming entangled or injured and permit the animal's access to adequate shelter, food, and water. Violation of this section constitutes a misdemeanor.

"This section shall not apply to an animal which is in transit, in a vehicle, or in the immediate control of a person."

Section 597.1, subdivision (a), provides in relevant part: "Every owner, driver, or keeper of any animal who permits the animal to be in any building, enclosure, lane, street, square, or lot of any city, county, city and county, or judicial district without proper care and attention is guilty of a misdemeanor."

deputies visited defendant's property, located deep in the woods in a remote part of Santa Cruz County. They found defendant standing in the midst of a canine charnel house. Some dogs lay dead or dying. Most of the rest, in the dozens, were skin and bones from starvation, suffering from infection, flea-ridden to a life-threatening degree, worm infested, panting in cages exposed to the remote area's high temperature that day, putrefying with open sores, malnourished, injured, and/or battle scarred from fights over food. One employee witnessed dog-on-dog predation first hand. As he stood talking with defendant through a fence, 10 or 15 dogs began to attack another dog, "just ripping it apart." Defendant managed to fend off the attacking dogs, then removed the victim dog from the animal control employee's sight and pronounced that it was fine. The property exuded odors of excrement and septic putrefaction. The authorities found one dog that they estimated had been confined in a pickup truck cab for a month or more. The truck's windows were closed and the air temperature was in the 90's that day.

Defendant had mounted a display of aligned dog skulls at one location. Over time, the sun had bleached the skulls. At another, defendant had fastened a dog's head to the top of a trimmed tree trunk.

Defendant was operating a dog-breeding facility. He called it Gladiator Cane Corso. A would-be customer, William George Fritz, IV, testified that in 2006 defendant showed him two puppies that were in appalling condition. One of the dogs had swollen and bleeding paws. They had lost much of their hair and were emaciated, with rib cages and backbones showing. Defendant appeared indifferent to their plight. Fritz told defendant that the dogs were dying and defendant replied that he had abandoned them to their fate.

The next day, Fritz went back and rescued the dogs. He paid defendant $200 for each one. The dogs were so weak that he had to carry them to his truck. They were covered with mites, had sores, and smelled bad.

Early in 2007, Fritz complained to various agencies, including the Animal Services Authority, and each entity said that the area of defendant's property did not lie within their jurisdiction. The Animal Services Authority staff member or members he spoke to "weren't interested" in the situation.

As noted, however, in 2008 Animal Services Authority employees and one or more sheriff's deputies did visit defendant's property. Defendant barred everyone from his property and resisted furnishing identification and being cited. The law enforcement and animal regulation officials departed, but soon returned in larger numbers to execute a search warrant and rescue the dogs. This visit led to the charges against defendant. Defendant tried to evade the raiders by running toward his house but eventually let them onto his property.

## II. *Defense Case*

Defendant testified on his own behalf.

Defendant was trying to breed various breeds of guard dogs. This was partly for business purposes and partly for personal reasons, the latter including a desire for companionship and to fend off his neighbors, whom he suspected of vandalism. He developed his dog-feeding practice according to his understanding of wolfpack feeding habits, which are competitive, but he would control and supervise the feeding for safety. He picked up animal droppings daily and kept the property mostly clean and odor free, although he would allow feces to accumulate in one area as "a nutrient bed."

Defendant further testified that the severed heads belonged to dogs that he believed had been deliberately poisoned by his neighbors. He believed the same about a dead dog on his roof. Dog bodies lay about because his ribs were injured at the time the dogs had died and he was suffering from abdominal problems. Weakness and pain left him unable to bury them.

## III. *Restitution Hearing*

Before the jury, evidence had been introduced that the Animal Services Authority had to assess the dogs that were still alive and provide medical treatment, rehabilitation, and housing services to some of them while euthanizing others. It treated and/or sheltered about 80 dogs and exhausted its funds in the course of doing so. Community donations of time and money, however, enabled the dogs to be treated properly. At the restitution hearing, the prosecutor and defense counsel both mentioned 51 dogs, but defendant's motion to reduce restitution stated that puppies were born in captivity from the captured dog population. Ultimately, the record is unclear on how many dogs were involved, but it is clear that there were dozens of them.

The trial court originally proposed to order economic-victim restitution to the agency of $149,754.73 to compensate it for the cost of providing these services.

At a restitution hearing following defendant's convictions, the trial court disallowed or reduced various items sought by the agency, thereby reducing its original calculation. Ruling against defendant in two instances, however, the court denied his request to reduce the restitution amount based on his contention that the agency was comparatively at fault under principles articulated in *People v. Millard* (2009) 175 Cal.App.4th 7 [95 Cal.Rptr.3d 751] (*Millard*). It also denied his request to set off against the agency's expenses $4,835 in fees listed on an adoption schedule that the agency may have

collected in placing defendant's puppies with new owners. After making these decisions, the court calculated the total restitution due the Animal Services Authority to be $127,331.33 and ordered defendant to pay this amount to the agency.

The basis for defendant's comparative fault argument was that the authorities, apparently including the Animal Services Authority, had discovered equally bad conditions on his property in 2005 and done nothing to remediate them, thereby allowing him to breed more dogs and generate more rehabilitation expenses for the Animal Services Authority.

In support of this argument, defense counsel alluded to the following information about events in 2005:

In a pretrial motion, the prosecution sought to introduce under Evidence Code section 1101 evidence surrounding the service of an administrative warrant on defendant's property on November 30, 2005. The prosecution wrote: "[What] Deputy Lansdowne mainly remembers is the smell of the property. There was feces all over the area, and he remembers that he had to walk carefully to not step in any dog poop. After they executed the warrant, he had to wash off his boots. When they came to the property, he assisted in cutting the gate for the Planning Department. When they entered the property, they either used a road flare or a fire extinguisher to scare the aggressive dogs away. [¶] As they entered the property, there was a bunch of dogs that were in a cage up to the 'left' of the property and a series of dogs that were just running loose. He remembers that one dog was in a cage and Animal Control took the dog [because] it was sick."

In the hearing on the pretrial motion, the prosecutor stated that "animal control officers" were present for the 2005 raid on defendant's property. He described the conditions they found. There were "feces over the property" and "the property smelled. . . . [T]here was a dog actually in a portable container in a cage that was removed[,] . . . exactly the same circumstance in 2008. In fact, what was surprising to me as I was talking to [Deputy] Lansdown[e] is that he described that operation exactly the same going on in 2005 as it is in 2008. There was absolutely no difference right down to where the pens were, to the number of dogs, to how they were running, to how he was dealing with them. There is really just no difference." The prosecutor acknowledged, however, that the administrative warrant ultimately was not upheld by a detention officer.[2]

---

[2] At the restitution hearing, the prosecutor may have been referring to the detention officer's decision on the administrative warrant when he asserted that an external decision thwarted the Animal Services Authority from remediating the situation in 2005. "I think it's unfair to blame

## DISCUSSION

Defendant contends that the trial court erred under state law by refusing to operate under comparative fault principles and to set off the $4,835 in adoption fees.

### I. *Standard of Review*

The parties state that the standard of review is abuse of discretion. Our view is somewhat different.

We will consider the trial court's explicit or implicit factual considerations regarding the amount of a restitution award for abuses of discretion. The law is well settled in this regard. "In reviewing a trial court's restitution order, we will not overturn its decision unless it constitutes an abuse of discretion. [Citations.] . . . An abuse of discretion will not be found if there is a factual or rational basis for the amount of restitution ordered." (*People v. Fortune* (2005) 129 Cal.App.4th 790, 794 [28 Cal.Rptr.3d 872].) "[T]he court's discretion in setting the amount of restitution is broad, and it may use any rational method of fixing the amount of restitution as long as it is reasonably calculated to make the victim whole." (*People v. Baker* (2005) 126 Cal.App.4th 463, 470 [23 Cal.Rptr.3d 871].)

However, no court has discretion to make an order not authorized by governing law, and that limits our deference to a trial court's determination regarding the restitution a criminal defendant owes. It has been observed that an abuse of discretion "arises if the trial court based its decision on . . . [citation] . . . an incorrect legal standard." (*People v. Knoller* (2007) 41 Cal.4th 139, 156 [59 Cal.Rptr.3d 157, 158 P.3d 731] [speaking of the granting of a new trial motion].) This standard has been articulated in the context of the validity of a restitution award: "The standard of review of a restitution order is abuse of discretion, but 'a restitution order "resting upon a ' "demonstrable error of law" ' constitutes an abuse of the court's discretion." ' " (*People v. Duong* (2010) 180 Cal.App.4th 1533, 1537 [103 Cal.Rptr.3d 678].)

As a practical matter, an appellate court's consideration of a claim that a trial court abused its discretion in awarding restitution because the lower court applied an incorrect legal standard is tantamount to independent or de novo review. As one court has observed, "when the propriety of a restitution order turns on the interpretation of a statute, a question of law is raised, which is subject to de novo review on appeal." (*People v. Williams* (2010) 184

the County for not dealing with Mr. Brunette in 2005 considering they tried to. Mr. Brunette fought them on every turn. Won a decision against the County that essentially said they needed to back off of him, so they did."

Cal.App.4th 142, 146 [108 Cal.Rptr.3d 772].) To be precise, applying a statute or decisional rule to factual determinations about restitution amounts involves considering a mixed question of law and fact that is predominantly legal, requiring independent review. (See *People v. Gamache* (2010) 48 Cal.4th 347, 385 [106 Cal.Rptr.3d 771, 227 P.3d 342] [stating the same principles of deference and nondeference in considering the admissibility of an extrajudicial statement]; *People v. Superior Court (Nasmeh)* (2007) 151 Cal.App.4th 85, 95 [59 Cal.Rptr.3d 633] [same, considering the adequacy of the description of property in a seizure warrant]; see also *Nasmeh*, at p. 98.)

Accordingly, the standard of an appellate court's review of the ultimate question when the legal basis for a restitution award is under challenge is de novo or independent review. To summarize, in such circumstances we apply the abuse-of-discretion standard to the trial court's determination of predominantly factual matters regarding restitution and independent review to the legality of the restitution award in light of the applicable statutes and any relevant decisional law.

## II. *Comparative Fault Claim*

Both parties imply in their appellate briefs that resolution of this case turns on an interpretation of section 1202.4 and the extension (or not) of *Millard, supra*, 175 Cal.App.4th 7, a case interpreting section 1202.4, to the facts of this case. As we will explain, this case involves a different statute, subdivision (f)(1) of section 597 (see also § 597.1, subd. (k)), and different factual considerations.

The trial court conducted the restitution hearing on the basis of section 597, subdivision (f)(1), an applicable statute along with subdivision (k) of section 597.1. The parties' reliance on section 1202.4 on appeal seems to stem from extraneous considerations, namely defendant's desire for a reduced restitution award based on alleged comparative fault and the People's desire to have us disapprove *Millard, supra*, 175 Cal.App.4th 7. It is, nonetheless, subdivision (f)(1) of section 597 that governs this case. Although, as we will explain, defendant would not be liable to the Animal Services Authority at all under section 1202.4, he is liable to it under subdivision (f)(1) of section 597, and we find no reason in the law to disturb the court's decision not to apply comparative fault principles to reduce the restitution.

### A. *Direct Victim Restitution (§ 1202.4)*

The statute that is of most interest to the parties, section 1202.4, has no bearing on this case. To be sure, the trial court's minute orders of January 22 and April 2, 2010, called the Animal Services Authority the beneficiary of

"restitution to the victim," which implies the application of section 1202.4, and the court referred to both sections 597 and 1202.4 at the end of the restitution hearing[3] and imposed a 10 percent interest award, authority for which can be found in section 1202.4, subdivision (f)(3)(G) but not in section 597 or 597.1. Against this, however, defendant's restitution memorandum invoked section 597 and the hearing was conducted under the auspices of section 597 notwithstanding the court's mention in passing of section 1202.4 and its imposition of the interest award. Regarding the latter, the court granted interest to the Animal Services Authority without announcing a statutory basis for it.[4]

■ If section 1202.4 and the antecedent article I, section 28, subdivision (b) of the California Constitution governed this case, the Animal Services Authority would be entitled to no compensation at all, whether in its own right or on behalf of the abused dogs, and would have to recoup its costs in civil court. The constitutional provision and section 1202.4 apply to persons, not dogs. (See generally Cal. Const., art. I, § 28 [implying throughout that the victim is a human being] and especially § 28, subd. (b)(13)(A) [referring to "persons" as the fitting subjects of restitution]; § 1202.4 [implying throughout that the victim ordinarily is a human being] and especially § 1202.4, subd. (k) [enlarging the categories of eligible restitution recipients to include the victim's immediate surviving family, certain private and public entities, and certain other individuals].) In addition, the provisions apply to economic losses, not pain and suffering. (See Cal. Const., art. I, § 28, subd. (b)(13)(A), (B); § 1202.4, subds. (a)(1), (f), (j) & (k)(3); cf. § 1202.4, subd. (f)(3)(F) [allowing restitution for noneconomic losses if the perpetrator committed a felony violation of § 288].) ■ As noted, section 1202.4 further applies to certain public and private entities, and the Animal Services Authority might be a qualifying organization, except that the entity must be "a direct victim of [the] crime" (§ 1202.4, subd. (k)(2)), which the Animal Services Authority is not.

We shall explain the latter point further.

■ "In 1982, California voters passed Proposition 8, also known as The Victims' Bill of Rights. . . . [Citations.] Proposition 8 established the right of

---

[3] The trial court said: "The Court does find that the staff cost of mileage, water, bait and time are not appropriate matters for restitution under Penal Code Section 1202.4 nor [*sic*] Penal Code Section 597. Those will be disallowed."

[4] Defendant argues that subdivision (f)(1) of section 597 does not provide authority to impose interest. We are not aware of any other basis on which the award of interest might be justified, and the People do not mention any such basis, so we will reverse the judgment to the extent it awards interest.

crime victims to receive restitution directly 'from the persons convicted of the crimes for losses they suffer.' " (*People v. Giordano* (2007) 42 Cal.4th 644, 652 [68 Cal.Rptr.3d 51, 170 P.3d 623].) Proposition 8 added new article I, section 28, subdivision (b) to the California Constitution (*Giordano, supra*, at p. 652), which at the time of the offenses in this case, but not at the time of sentencing, provided that "all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for losses they suffer." (Cal. Const., art. I, § 28, former subd. (b).)[5]

▮ To give continuing effect to Proposition 8, which was not self-executing, the Legislature eventually enacted a version of section 1202.4 that consolidated a number of restitution statutes. (*People v. Giordano, supra*, 42 Cal.4th at pp. 652–653.) It has continued to refine section 1202.4, the result being the version in effect today. Under section 1202.4, the trial court must order direct victim restitution "in every case in which a victim has suffered economic loss as a result of the defendant's conduct." (§ 1202.4, subd. (f); see also *id.*, subd. (a)(1).) The court "shall require" the defendant to make restitution "based on the amount of loss claimed by the victim or victims or any other showing to the court. . . . The court shall order full restitution unless it finds compelling and extraordinary reasons for not doing so, and states them on the record." (§ 1202.4, subd. (f).)

▮ Section 1202.4, subdivision (f)(3), provides that "[t]o the extent possible, the restitution order . . . shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct, including, but not limited to" 11 enumerated categories of losses. "[D]irect victims of crime have a statutory right to restitution on the full amount of their losses without regard to the full or partial recoupment from other sources (except the state Restitution Fund)." (*People v. Baker, supra*, 126 Cal.App.4th at p. 468.)

---

[5] The voters amended article I, section 28 by initiative measure (Prop. 9) on November 4, 2008. Section 28, former subdivision (b), quoted in the text, was changed soon after defendant was charged with committing his animal welfare crimes.

For reference purposes, we note that the current language of article I, section 28, subdivision (b), provides:

"(b) In order to preserve and protect a victim's rights to justice and due process, a victim shall be entitled to the following rights: [¶] . . . [¶]

"(13) To restitution.

"(A) It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer.

"(B) Restitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss.

"(C) All monetary payments, monies, and property collected from any person who has been ordered to make restitution shall be first applied to pay the amounts ordered as restitution to the victim." (Cal. Const., art. I, § 28, subd. (b).)

■ "[T]he term 'victim' has a broad and flexible meaning." (*People v. Saint-Amans* (2005) 131 Cal.App.4th 1076, 1084 [32 Cal.Rptr.3d 518].) It is not so broad, however, as to encompass the Animal Services Authority in this case.

■ Subdivision (k) of section 1202.4 states: "For purposes of this section, 'victim' shall include all of the following: [¶] . . . [¶] (2) Any corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision, agency, or instrumentality, or any other legal or commercial entity *when that entity is a direct victim of a crime*." (§ 1202.4, subd. (k)(2), italics added.) "Thus, Penal Code section 1202.4, subdivision (k) permits restitution to a business or governmental entity only when it is a *direct victim* of crime." (*People v. Martinez* (2005) 36 Cal.4th 384, 393 [30 Cal.Rptr.3d 779, 115 P.3d 62]; accord, *People v. Anderson* (2010) 50 Cal.4th 19, 28 [112 Cal.Rptr.3d 685, 235 P.3d 11]; see *People v. Duong, supra*, 180 Cal.App.4th at p. 1537; see also *People v. Birkett* (1999) 21 Cal.4th 226, 243 [87 Cal.Rptr.2d 205, 980 P.2d 912] [interpreting art. I, § 28, of the Cal. Const.].) "Both the generality and the inconsistency of [the] constitutional phrases precludes any determination that indirect victims such as reimbursing insurers are included . . . ." (*Birkett, supra*, at p. 243.) As is evident in subdivision (k) of section 1202.4, there is "no indication that in adopting Proposition 8's restitutionary provisions, the electorate was concerned with anything other than victims as ordinarily understood, i.e., those *against whom crimes had been committed*." (*Birkett, supra*, at p. 243, italics added.)

Defendant committed no crime against the Animal Services Authority and it was not a direct victim eligible for restitution under section 1202.4. Analogous cases so provide. When the crime consisted of inflicting injury on an elder victim, the treating hospital was not a direct victim of the crime entitled to section 1202.4 restitution even though it incurred economic losses. (*People v. Slattery* (2008) 167 Cal.App.4th 1091, 1096–1097 [84 Cal.Rptr.3d 672].) In that case, the victim, the defendant's mother, failed to pay her hospital bills, but *Slattery* held that the hospital "must recoup its costs through other means." (*Id.* at p. 1097.) Similarly, our Supreme Court held that California's Department of Toxic Substances Control was not a direct victim of attempted methamphetamine production in incurring costs cleaning up waste material from a malefactor's attempt to produce that substance and it, too, must recoup its losses through other means. (*People v. Martinez, supra*, 36 Cal.4th at pp. 386, 393–394.)

B. *Animal Care Restitution (§ 597, subd. (f)(1))*

Subdivision (f)(1) of section 597 provides: "Upon the conviction of a person charged with a violation of this section by causing or permitting an act of cruelty, as defined in Section 599b, all animals lawfully seized and impounded with respect to the violation by a peace officer, officer of a humane society, or officer of a pound or animal regulation department of a public agency shall be adjudged by the court to be forfeited and shall thereupon be awarded to the impounding officer for proper disposition. A person convicted of a violation of this section by causing or permitting an act of cruelty, as defined in Section 599b, shall be liable to the impounding officer for all costs of impoundment from the time of seizure to the time of proper disposition." (See also § 597.1, subd. (k) [to the same effect].)[6]

As mentioned, defendant contends that the trial court should have followed the holding of *Millard, supra,* 175 Cal.App.4th 7, that restitution awards under section 1202.4 may be apportioned under comparative fault principles, and the People urge us to reject not only defendant's claim but the basis for it, i.e., *Millard*'s reasoning.

*Millard,* however, is distinguishable in these respects: it considered a different statute (§ 1202.4) from the one at issue here (§ 597); the victim in *Millard* bore major responsibility for his injuries, whereas the dogs here bore none for their plight; and the malefactor in *Millard* was criminally negligent, whereas here the trial court could perceive that defendant's mental state was worse.

In *Millard,* the defendant, while driving with a blood-alcohol concentration of more than 0.1 percent, suddenly turned in front of and struck the victim, who was traveling in an oncoming lane on a motorcycle. (*Millard, supra,* 175 Cal.App.4th at pp. 13–15.) The motorcyclist was permanently disabled. (*Id.* at pp. 20–21, 22, 29–30.) The trial court found the motorcyclist 25 percent at fault and lowered the restitution award by one-quarter under comparative fault principles. (*Id.* at p. 24.) The appellate court affirmed, holding that the trial court properly reduced the restitution award. (See generally *id.* at pp. 36–43.)

In general, the issue in *Millard* was whether under section 1202.4 "a trial court may apply the doctrine of comparative negligence in awarding victim restitution against a criminally negligent defendant when the court finds the victim's contributory negligence was a substantial factor in causing his or her

---

[6] As our discussion proceeds, we will not continue to address subdivision (k) of section 597.1, because that provision is similar enough to subdivision (f)(1) of section 597 that examining the latter provision will suffice.

injuries." (*Millard, supra*, 175 Cal.App.4th at p. 13; accord, *id.* at pp. 39, 40.) *Millard* held that a court may do so "when the victim's negligence was also a substantial factor in causing his or her injuries." (*Id.* at p. 36, fn. omitted.)

*Millard* recited what it viewed to be the injured motorcyclist's substantial want of care in the operation of his motorcycle, and the case must be understood in light of that circumstance. The trial court in *Millard* stated: " 'The court finds that the evidence is clear that Mr. Payne [(the motorcyclist and victim)] was driving at a high rate of speed, [was] driving an unsafe vehicle, was untrained in motorcycle driving, took no evasive maneuvers and in essence went straight into the defendant's car without even a minimal amount of avoidance taken. Mr. Payne even had himself in the 3rd lane of traffic prior to the accident. The court having heard the trial became convinced that Mr. Payne was a contributory cause of the accident.' " (*Millard, supra*, 175 Cal.App.4th at p. 37.) The court found that the victim's incompetent motorcycling constituted " 'compelling and extraordinary reasons for not' " (*ibid.*) awarding full restitution (see § 1202.4, subd. (g); but see *Millard, supra*, at p. 42, fn. 16 [stating that a court need not so find before apportioning a restitution award under comparative fault principles]).

The People argue that in all cases, criminally negligent acts are more blameworthy than negligent acts or omissions in civil cases, so that the civil law doctrine of comparative fault may not be extended to crime-based restitution awards. Accordingly, they ask us to disagree with *Millard*'s basic premise. We will not do so, however. Because, as stated, *Millard* is distinguishable in various respects, it is not necessary.

That brings us to the other distinguishing factors we mentioned at the beginning of this discussion.

*Millard* operated on the premise that there was a human crime victim, which is correct under section 1202.4, and that the victim and the perpetrator each played a role in the accident. By contrast, as we explained *ante*, at page 278, the dogs that defendant allowed to die or to suffer are not cognizable as victims under section 1202.4. They were, however, crime victims in a general sense. Moreover, unlike *Millard*'s motorcyclist, they bore no culpability that might apply to a comparative fault analysis. They were the hapless victims of defendant's cruelty and nothing more than that.

Finally, the trial court could decide that defendant's conduct was not simply criminally negligent but instead depraved or the result of a combination of depravity and mental illness.[7]

■ The trial court could consider that in its depravity, defendant's death-dealing cruelty toward the dogs constituted the equivalent of the statutory implied malice murder definition, i.e., murder committed with "an abandoned and malignant heart." (§ 188; see *People v. Bland* (2002) 28 Cal.4th 313, 330 [121 Cal.Rptr.2d 546, 48 P.3d 1107].) Such murder is unlawful homicide committed without an intent to kill but, under one definition the courts have furnished for it, achieved "when [the] defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life." (*People v. Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279].) Wantonness implies recklessness in terms of the degree of risk of which the actor is aware and wanton is a fitting adjective for conduct that is not only reckless but also callous, heedless and cruel. (See 19 Oxford English Dict. (2d ed. 1989) p. 882, col. 2 [see definition A.5.b of "wanton"]; see also Black's Law Dict. (9th ed. 2009) pp. 1719–1720 ["wanton" means "[u]nreasonably or maliciously risking harm while being utterly indifferent to the consequences."].)

Defendant's lack of care for his dogs was in wanton disregard for their lives. It is close enough to the criminal equivalent of an intentional tort to bar invoking comparative fault principles. "[T]here is 'an unbroken line of authority barring apportionment [based on comparative fault] where . . . the defendant has committed an intentional tort [e.g., battery] and the injured plaintiff was merely negligent.' " (*Millard, supra,* 175 Cal.App.4th at p. 38.) *Millard* concluded only that "we do not believe the application of the doctrine of comparative negligence is barred by those provisions when a defendant's offense is, in effect, merely criminal negligence, in contrast to the intentional crimes and torts (e.g., murder, robbery, and battery) to which the doctrine of comparative negligence would not apply." (*Id.* at p. 41.)

Defendant argues that his conduct was criminally negligent by definition, at least as far as the two felony animal cruelty convictions under subdivision (b) of section 597 and the three misdemeanor animal neglect (§ 597.1, subd. (a)) convictions are concerned, because the mental element for that offense is criminal negligence and the jury was so instructed.

---

[7] Defendant's mental state was not at issue at trial, but the jury heard testimony that he was living in nightmarish filth on the premises. His residence was a rat's nest of garbage, debris, and dog feces and urine. Dozens of bottles that appeared to be filled with human urine were lying about the property. An ammoniacal stench inside the house was "almost strangling."

Defendant is correct that *People v. Speegle* (1997) 53 Cal.App.4th 1405 [62 Cal.Rptr.2d 384], so held. At least the case may be read as having so held. (*Id.* at pp. 1411–1413 [addressing § 597, subd. (b)], 1413–1416 [addressing § 597f, a statute similar to § 597.1].)

■ Nevertheless, criminal negligence is the minimum, i.e., least culpable mental state for convictions under subdivision (b) of section 597 and subdivision (a) of section 597.1. In criminal law, mental states run from bad to worse roughly in order of negligence, recklessness, knowledge, and purpose (see Yee, *Forfeiture of the Confrontation Right in Giles: Justice Scalia's Faint-hearted Fidelity to the Common Law* (2010) 100 J. Crim. L. & Criminology 1495, 1536), with willfulness, maliciousness, and similar adjunct mental states interspersed at various levels in that hierarchy. ■ In considering whether to reduce the award on comparative fault principles, the trial court could look beyond the level of culpability minimally necessary for the convictions to assess the quality of defendant's actions under all the circumstances set forth in the record. " ' " ' "[S]entencing judges are given virtually unlimited discretion as to the kind of information they can consider and the source . . . whence it comes." [Citation.]' [Citation.] [¶] This is so because a hearing to establish the amount of restitution does not require the formalities of other phases of a criminal prosecution. [Citation.]" ' " (*People v. Baker, supra,* 126 Cal.App.4th at p. 470.) Accordingly, the court, solely for purposes of addressing defendant's comparative fault argument in the hearing on restitution under section 597, subdivision (f)(1), could assess all of the circumstances, which here, the court could decide, involved a depraved mental state and wanton and vile acts in aggravation and possible madness in mitigation. Because direct restitution to redress economic losses is not a criminal punishment (*People v. Kunitz* (2004) 122 Cal.App.4th 652, 657 [18 Cal.Rptr.3d 843]; *People v. Harvest* (2000) 84 Cal.App.4th 641, 645, 649 [101 Cal.Rptr.2d 135]), there is no constitutional problem inherent in such a procedure.

Moreover, even if the trial court decided to interpret defendant's conduct as merely criminally negligent, we would doubt that comparative fault principles should apply to set off liability under sections 597, subdivision (f)(1), or 597.1, subdivision (k), in light of the circumstances of this case.

■ Criminal negligence is a more culpable mental state than the negligence that generates tort liability. It is, as a rule, in tort cases that comparative fault principles are applied (see *Ford v. Gouin* (1992) 3 Cal.4th 339, 356 [11 Cal.Rptr.2d 30, 834 P.2d 724]; *Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 348 [145 Cal.Rptr. 47]) and there is no reason to depart from that rule here. Ordinary civil negligence standards tend not to apply in the criminal

context, although we will stop short of saying that they never do. "Conduct which creates an unreasonable risk of injury to other persons or to their property is generally termed 'ordinary negligence,' a type of fault which will generally serve as the basis for tort liability and occasionally for criminal liability. Conduct which creates not only an unreasonable risk but also a 'high degree' of risk (something more than mere 'unreasonable' risk) may be termed 'gross negligence,' and if in addition the one who creates such a risk realizes that he does so, his conduct may be called 'recklessness.' " (LaFave, Substantive Criminal Law (2d ed. 2003) § 14.4(a), p. 437, fns. omitted.) Our Supreme Court noted the difference many years ago in discussing involuntary manslaughter: "something more than ordinary negligence is needed to constitute either culpable negligence or criminal negligence under involuntary manslaughter statutes." (*People v. Penny* (1955) 44 Cal.2d 861, 877 [285 P.2d 926], italics omitted.) " 'The negligence must be aggravated, culpable, gross, or reckless, that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences.' . . . '. . . The facts must be such that the fatal consequence of the negligent act could reasonably have been foreseen. It must appear that the death was not the result of misadventure, but the natural and probable result of a reckless or culpably negligent act.' " (*Id.* at pp. 879–880.)

In light of these principles, we see no reason to extend the reasoning of *Millard, supra,* 175 Cal.App.4th 7, to reduce defendant's financial liability, given the relationship between him and his dogs. Unlike the situation in *Millard,* where the victim had a degree of control, defendant wholly controlled the horrific conditions at his forest stronghold and the dogs had no control, except the minimal amount available to establish one or more hierarchies among themselves in fights over food.

### C. *Conclusion*

The trial court did not err in declining to apportion liability under comparative fault principles. Accordingly, we reject defendant's claim.

### III. *Offset Claim*

Defendant claims that the trial court abused its discretion by not setting off the restitution award by $4,835 he asserts the Animal Services Authority obtained in fees by adopting out a number of puppies and one adult dog that it recovered from his property. We do not agree.

Before the trial court, defense counsel asserted that the Animal Services Authority kept an adoption log that showed it was able to adopt out 27 puppies and one adult dog, and that the agency's fee schedule indicated that the adoption fee for the puppies was $175 each and $110 for the adult dog. Counsel argued that the restitution award should be offset by the presumed adoption fees of $4,725 for the puppies and $110 for the adult dog.

This issue is primarily factual and subject to a pure abuse-of-discretion standard of review. (P. 276, *ante*.) As stated, "the court's discretion in setting the amount of restitution is broad, and it may use any rational method of fixing the amount of restitution as long as it is reasonably calculated to make the victim whole." (*People v. Baker, supra*, 126 Cal.App.4th at p. 470.)

The Animal Services Authority incurred shelter expenses for a number of dogs as a result of the raid on defendant's property. The log that defendant provided to the trial court showed the adoption fee schedule, but he did not provide records of the fees the agency obtained through adoptions. They might have varied from the schedule for reasons not apparent in the record. Moreover, as noted, most of the dogs were in poor condition. The trial court could reasonably have found, albeit implicitly, that setting off the payment by the amount listed in the adoption schedule would undercompensate the Animal Services Authority. It would do so because the adoption fee revenues themselves likely were offset by additional costs incurred in treating these dogs to bring them to a level of health that would make them not just free of critical health impairments but suitable for adoption. Prospective adopters might insist on adopting a dog not suffering from unappealing physical and/or behavioral problems. The agency's log regarding 29 adopted-out dogs shows medical and behavioral problems even with those successfully placed dogs. Thus, accepting defendant's point that the Animal Services Authority's "expenses in boarding and caring for the puppies were [already] part of the restitution order," we have no basis to know that mere board and care made them adoptable; the agency may have had to spend more money to make them so. We find no abuse of discretion in the court's denial of defendant's motion to reduce the award by $4,835.

## CONCLUSION

We see no reason, given the facts of this case, to disturb the trial court's decision not to apply comparative fault principles in defendant's favor. As for the agency's alleged recovery of $4,835 in adoption fees, we uphold the trial court's ruling that defendant should receive no offsetting benefit, inasmuch as the net benefit to the agency from any fees it recovered is uncertain in the record.

## DISPOSITION

The judgment is reversed to the extent that it imposes an interest charge on the restitution award. In all other respects, the judgment is affirmed.

Rushing, P. J., and Grover, J.,[*] concurred.

---

[*]Judge of the Monterey Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.