Filed 7/22/15  P. v. Stark CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>BRUCE ANTHONY STARK,<br><br>        Defendant and Appellant. | A141131<br><br>(Lake County<br>Super. Ct. No. CR930046A) |

## INTRODUCTION

Defendant Bruce Stark was the pastor of a small church in Lake County.  He pleaded no contest to grand theft of property from the church over a period of five years.  He timely appeals from the court's restitution order insofar as it awards the church $11,413.03 for lease payments made by a church member on ATM/credit card equipment used in defendant's water company.  We find merit in defendant's contention.  We will modify and, as modified, affirm the court's restitution order, minus the award of $11,413.03.

## STATEMENT OF THE CASE

In August 2012, defendant was charged with one felony count of grand theft of money, real property, a van, and electronic equipment, the property of Hilltop Apostolic Church, from May 2005 through August 2010.  (Pen. Code, § 487, subd. (a).)[1]  The

---

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

complaint also alleged the value of the property taken, damaged or destroyed exceeded $50,000 and that the thefts were not discovered until February 2009. (§§ 12022.6, subd. (a), 803, subd. (c).)[2]

Defendant pleaded no contest to grand theft, and the loss allegation was dismissed with a *Harvey* waiver. (*People v. Harvey* (1979) 25 Cal.3d 754.) Defendant's attorney stipulated to a factual basis for the plea.[3] (*People v. West* (1970) 3 Cal.3d 595.) After consideration of the probation report and defendant's testimony, the court sentenced defendant to state prison for three years.

A hearing to determine restitution was held over four dates in May and June 2014. On June 16, 2014, the court issued a written restitution order in the amount of $110,478.14. Defendant filed a timely notice of appeal from the restitution order.

## STATEMENT OF THE FACTS [4]

Defendant was pastor of Hilltop Apostolic Community Church from 2002 to 2008. At the time defendant was pastor, the church had 10 to 12 members. The church subscribed to a tithing obligation. According to the current pastor, tithing is a voluntary donation to the church of 10 percent of a member's income. It is paid by cash or check to the church, not to the pastor directly. Defendant believed the tithing was for the "upkeep of the priesthood," and when he needed funds, he could get them from the church account because the tithing was deposited into that account. He did not need board approval to do

---

[2] Defendant's wife was also charged in the complaint but is not a party to this appeal.

[3] The parties stipulated that "between the dates of May 13th, 2005, and August 26th, 2010, . . . during much of which time Mr. Stark was employed by the Hilltop Epistolic [*sic*] Church in Lower Lake, Mr. Stark stole several items, including real property, personal property belonging to the church and to members, and also money, with the intent to deprive those persons permanently of said items."

[4] The factual summary is drawn from the probation reports filed on February 18 and May 15, 2014 in the trial court, and from the evidence adduced at the sentencing and restitution hearings.

that. Defendant paid for personal expenditures, such as his DirecTV bills, out of the church's account.

About three months after the proceeds of a loan were disbursed to the church's account, Ms. Carol Powell went to the bank at the deacon's behest because a check had bounced. She found out the church had only $15 and change in its account. Ms. Powell expected there to be "[a]t least about [$]54 or [$]53,000." She filed a forgery claim with the bank and went to the Clearlake Police Department.

According to the probation report, on January 10, 2010, church secretary Gloria Turner told a Clearlake police detective that while defendant was pastor, he "forged and cashed numerous church checks, stole church offerings, mortgaged or put up as collateral parcels of land owned by the church and left Clearlake with the church's van." He was responsible for $54,006.42 missing from the church bank account, had mortgaged 20 parcels of land owned by the church for $25,000, taken the church van to a multi-church gathering in 2007 and failed to return it, absconded with $1,200 in donations made to the church at the gathering, and had written checks to himself or family members without the express approval of the board of directors, which was required.

In addition, "the church benefactor, Carol Powell, reported having purchased ATM credit card equipment for approximately $11,000 and donated the equipment to the church. The ATM credit card equipment was reported missing and being taken by the defendant."

Gloria Turner provided the probation department with a claim for restitution on behalf of the church requesting (1) $91,939 for unauthorized or misappropriated checks, (2) $11,413.03 for the amount Carol Powell paid to TimePayment Corporation for the ATM/credit card equipment donated to the church, and (3) $25,000 for the total amount borrowed against the 20 parcels of land owned by the church, for a total restitution amount of $128,352.03.

With respect to the ATM/credit card equipment, the restitution request submitted by the church stated: "Carol Powell is requesting that the $11,413.03 which represents money she used to pay off TimePayment Corp be also restored to Hilltop Apostolic Community Church as this was Tithe/offering that belonged to the church, however Bruce Stark manipulated it into a business called Jamestown Pure Water Co under the guise of the Church." In her victim impact letter to the probation department, Carol Powell wrote: "I was deeply hurt by the betrayal of trust of ex-Pastor Bruce Stark. He forged my name on countless checks and stole my tithe of money and property to the Lord that was supposed to go to [Hilltop Apostolic Community Church]. . . . [¶] . . . [¶] I also invested in a business which Stark said would be for Hilltop Apostolic Church in which I invested 5 years['] worth of advanced tithes to help with, which he also mismanaged for his own personal gain."

*Sentencing Hearing*

Defendant testified that under the church's bylaws, which he produced at the hearing, the pastor was not a salaried employee but was entitled to receive the tithing and a stipend to pay for one-half of the pastor's monthly expenses.[5] However, by the time he became pastor, the church was unable to pay him because it was $157,000 in debt.

Regarding the commercial cash register, credit card machine and PIN pad, defendant testified he eventually found out that Carol Powell had purchased them. He put them in his store, Jamestown Pure Water. When he discovered TimePayment Corporation was trying to charge the church $10,500 for items he found at Home Depot for less than $700, he called the company and told them he did not want them and was

_____

[5] Defendant also testified Carol Powell and the former pastor drafted the bylaws in 1987. However, Powell testified at the restitution hearing she had never seen Exhibit N (the bylaws) before.

4

sending them back.  Defendant produced the UPS shipping order for the three pieces of equipment he sent back. [6]

Asked why the church "need[ed] something like that," defendant responded: "[B]ecause I wanted to keep the church, I went and took my cars, a Mercedes and a Lexus, and I sold them so that I could have money to buy this business.  The church didn't pay for it.  I sold my cars."

Two weeks later, he found out someone from the company had gotten in touch with Carol Powell and told her she had to pay for the machine, but he had already told Powell, "Don't pay them.  Have them contact me because I'm sending it back to the company because we don't have that kind of money."

***Supplemental Probation Report.***

After defendant was sentenced, Ms. Turner submitted additional loss documentation and a revised restitution request on the church's behalf for $144,820.21.  This total included the amount paid to TimePayment Corporation "for defendant's company Jamestown Pure Water Co. that he paid for using money tithed/offered to Hilltop Apostolic Community Church."  The new Summary of Restitution Request submitted to the probation department by the church explained that with respect to "Jamestown Pure Water Co—Carol Powell and Bruce Stark discussed that Stark wanted to open a business for the church to help the church.  He wanted Carol and him to become partners. . . .  She refused but she did offer to pay the lease for banking equipment with what she called advanced tithes in the amount of more than $10,000.  She

---

[6] The shipping order, dated January 29, 2008, reflected that customer "Carol Powell–James Town Pure Water" shipped a package weighing 51.32 pounds to TimePayment Corporation.  The shipping cost was $133.36, and the customer's signature was "Bruce Stark for Carol Powell."  A computerized version of the order listed the contents as "cash register, credit card machine w/pinpad."  A barely legible handwritten notation on the shipping order lists the contents as one Verifone 3750, a Verifone PIN pad and a Casio terminal.

was made to think this was for the church's benefit, however later discovered it was all about Bruce Stark. The church never saw any of the proceeds from this business and it was never discussed with the congregation or Board of Directors. Carol Powell sought legal advice from her attorney and was advised to get out of this deal as it appeared Stark was either a 'scammee or a scammer.' Therefore, she paid off the equipment to keep her credit from getting ruined and her good name from being mixed up with Stark. She is requesting this money she paid goes back to the church where she originally intended it to go. We are requesting the $11,413.03 as restitution back to the church. ([S]ee attached copy of receipt.)"

Six pages of supporting documentation for this request were submitted. The first page is titled, "Non Cancellable Commercial Equipment Lease Agreement" and is dated November 17, 2007. It shows that Carol Horton Powell, doing business as Jamestown Pure Water in Stockton, California, authorized an automatic debit from a business checking account No. 3804275026 with Guarantee Bank. The name on the account was Jamestown Pure Water. The schedule of payments shows $215 per month for 48 months ($10,320). Identifying Ms. Powell as the owner, this document indicates she was the only lessee and personally guaranteed the lease. The equipment leased was described as one Verifone credit card terminal, one Verifone PIN pad, and one Casio terminal (which, a handwritten note states, was "recovered in Stockton").

The second page is an invoice from TimePayment Corporation to Jamestown Pure Water, indicating a deposit of $7,706.09 was received on November 28, 2007 for the three items listed on page 1. The third page is a lease application signed on November 17, 2007 by Carol Powell. It indicates the equipment to be leased was for Jamestown Pure Water of Stockton, which had been in business for three and one-half years. It lists as the guarantor Carol Powell of Clearlake, the "100% owner" of the company. The equipment and payments were the same as those listed on page 1.

The fourth page is a voucher or receipt showing a minimum lease payment of $7,706.09 from Carol A. Horton Powell to a dealer, apparently by check. The fifth and sixth pages are the terms and conditions of the lease agreement, initialed by Carol Powell.

***Restitution Hearing.***

Defendant testified the equipment at issue was purchased by his business, Jamestown Pure Water, for use in the water store. Carol Powell's connection to the business was that she was "the cosignor on it" because his "credit was not very well." The total cost came to "something like [$]10,000 and something." After he called Powell to tell her he was sending the equipment back because it was too expensive, the company contacted her and told her they had the machine but still wanted payment for it. Powell called him and said she had the machine back; she told him to take it and try to sell it. Defendant told her he could not get that kind of money back for it. He picked up the cash register from her house and took it back to his water store.

One Sunday in church, Powell handed him a note, which said: "Pastor, what if you wrote a check to me for advanced tithe, I sign it over as a personal loan to you, then I would just keep applying tithe and leave your paid back as in whatever tithe that is mine is your responsibility. Sister Powell." The note was introduced into evidence.

Carol Powell testified she was a lay member of the church. Prior to 2004 she was church secretary and a board member. She donated 20 lots of real property to benefit the church. She "called it a tithe and ascribed it was for the church."

Defendant lied to her when he said only three people needed to sign to get a loan against the property because they were being foreclosed upon. In fact, all board members needed to authorize a loan for the church. She agreed to authorize the loan because defendant told her if the loan was not approved, "we would lose the church."

With respect to the water company, defendant approached her to be a business partner. She declined. He then said he needed help to get an ATM machine. She "understood this was all to benefit the church" and "[t]hat all the money that he would

7

make from Jamestown Pure Water would be to help pay for Hilltop Church." She was the cosignor on the contract for an ATM machine owned by TimePayment Corporation. She gave the machine to defendant and told him it had to be paid off. He told her there was "no way we can—the church can pay you back." She said okay and defendant took the machine. She last remembered seeing it back at the church "as evidence." A cash register was retrieved and returned to the church by Detective Carl Stein.

Ms. Powell did not know what happened to the ATM machine. As far as Ms. Powell and Ms. Turner knew, the ATM machine was never returned to the church. Ms. Powell thought she may have sent it back to the company. Ms. Powell agreed she did tell defendant he could take that machine after it was returned to her by the seller.

Ms. Powell ended up paying off the entire amount of $11,000 because she was "equally liable for the total amount and could not rescind the contract. This was a noncancellable contract." If she had not paid, she would have been sued. No proceeds from the water business were returned to the church, to her knowledge. Nor was the business venture ever approved by the board.

Ms. Powell recognized the letter she wrote to defendant about the loan/check/tithe arrangement to pay for the ATM machine. She explained: "Pastor Stark came to me. He wanted help to get the ATM machine and to get the business going. This is only a proposal but was never anything further than that. Instead, what happened was I signed as a cosignor for the ATM machine. This didn't even make any sense to me when I read it. And I realized that's kind of silly."

Defendant maintained there was no separate ATM machine. The TimePayment Corporation equipment consisted of a cash register, a Casio connector to the cash register, and a PIN pad. Those three items were returned to Carol Powell. She gave him back the cash register, which Detective Stein recovered. After conferring with audience members off the record, the prosecutor represented to the court there were two machines, one of which was a cash register and another which had ATM capability, but the

8

audience members were not sure if it was a "straight-up A.T.M. machine or if it was an A.T.M. card reading machine." They did not gain possession of the second machine.

The prosecutor argued defendant should have to pay the entire amount, even though one machine was returned, stating: "Well, for what it's worth, neither of these machines were machines that were asked for by the church itself. These were ostensibly for Mr. Stark's business that he was starting up, which he asked Ms. Powell to provide funding for. So, she ended up having to pay for those machines, because she was in breach of a contract if she didn't."

### *The Trial Court's Restitution Order.*

The court ordered defendant to pay the church $110,478.14 in restitution, disallowing $34,342.07 of the church's claim. Specifically, the court reviewed the checks proffered by the church as evidence of $91,024.41 in unauthorized expenditures and disallowed $3,265 as checks for legitimate church expenses. The church also claimed $9,021.63 in overdraft fees and electronically debited personal items. The court reviewed bank statements and found the evidence supported a claim of $5,444.56 in check fees and electronically debited personal items. The court found no additional restitution was owed for the $25,000 loan obtained by defendant using vacant lots owned by the church as collateral. Out of the proceeds from the loan, almost $20,000 was used to pay for legitimate church expenses, such as back taxes and delinquent mortgage payments, and the remainder was drawn down by both authorized and unauthorized expenditures for which restitution had already been ordered. The court denied the church's request for $2,500 to compensate it for the loss of the church van, which the church sold as scrap for $200, because no evidence was presented to show "how defendant's conduct reduced the value of the van."

The court awarded the entire requested amount of $11,413.03 "for credit card terminals/cash registers leased by defendant from Jamestown Pure Water through TimePayment Corp. without authorization. The equipment was leased by Carol Powell

9

based on defendant's representations that the machines were to benefit the church. Ms. Powell intended this as a donation to the church, but later discovered that the equipment was solely for use in defendant's personal business operations. [¶] There was a dispute in the testimony on whether one or two terminals were acquired. Documents show two terminals and a pin pad were acquired (Prob.Rpt.Exh.#A-6). Church members stated that one of the machines was returned to the church. However, this was a lease agreement not a purchase, so the church would not have acquired ownership of either terminal. Ms. Powell was forced to pay the entire lease amount for the entire lease period. The documents show the lease agreement required 48 payments with a base monthly payment of $215.00 plus taxes and fees. The total base payments for 48 months would amount to $10,320.00. Ms. Powell indicated the total cost to her was $11,413.00; if taxes and fees are added to the total of base payments, this figure appears accurate. It is ordered."

## DISCUSSION

Defendant argues the court erred in finding that defendant owed restitution to the church for the payments made to TimePayment Corporation by Carol Powell, because the equipment was not a gift to the church, and the lease for the equipment was a business transaction between Ms. Powell and defendant. Consequently, the church was not a direct victim of a crime so far as the equipment or the lease payments were concerned.

Defendant's argument requires us to consider whether the church was a "direct victim" of the lease agreement under the relevant statutes and constitutional provisions. This is a legal question of statutory construction which we review de novo. (*People v. Saint-Amans* (2005) 131 Cal.App.4th 1076, 1084 (*Saint-Amans*); *People v. Brunette* (2011) 194 Cal.App.4th 268, 277.)

### The Church Was Not a Direct Victim of the Theft of the Lease Payments.

In California, "all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes

10

causing the losses they suffer." (Cal. Const., art. I, § 28, subd. (b)(13)(A).) Implementing that constitutional right, section 1202.4, subdivision (a)(1) provides "that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime." The sentencing court is required to order restitution for economic losses caused by the defendant, "based on the amount of loss claimed by the victim . . . or any other showing to the court" (§ 1202.4, subd. (f)), in an amount sufficient to fully reimburse the victim "for every determined economic loss incurred as the result of the defendant's criminal conduct" (§ 1202.4, subd. (f)(3)).

Economic losses include "[f]ull or partial payment for the value of stolen or damaged property. The value of stolen or damaged property shall be the replacement cost of like property, or the actual cost of repairing the property when repair is possible." (§ 1202.4, subd. (f)(3)(A).) The term "victim" includes "[a] corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision, agency, or instrumentality, or any other legal or commercial entity *when that entity is a direct victim of a crime*." (§ 1202.4, subd. (k)(2), italics added.)

Construing almost identical language in a predecessor statute to section 1202.4, subdivision (a)(1), our Supreme Court held that the Legislature intended to require the offender "to make *full* restitution for all 'losses' *his crime had caused, and* that such reparation should go entirely *to the individual or entity the offender had directly wronged*." (*People v. Birkett* (1999) 21 Cal.4th 226, 246 (*Birkett*).) "[R]estitution statutes should be interpreted broadly and liberally. [Citations.] Specifically, this state's Supreme Court has stated that the term 'victim' has a broad and flexible meaning." (*Saint-Amans, supra*, 131 Cal.App.4th at p. 1084.)

However, that meaning is not so broad and flexible that it includes entities that are indirect or collateral victims of the crime of which the defendant was convicted. The term "direct victim," as applied to entities, has been construed by our Supreme Court to

11

mean " 'entities that are the "immediate objects of the . . . offenses " '; or ' "entities *against which* the . . . crimes [have] been committed." ' [Citations.]" (*People v. Slattery* (2008) 167 Cal.App.4th 1091, 1095, citing *People v. Martinez* (2005) 36 Cal.4th 384, 393, quoting *Birkett, supra*, 21 Cal.4th at pp. 233, 232.) "A victim is the *object* of a crime. [Citations.] ' "Actual" ' or ' "direct" ' victims are 'the real and immediate objects' of the offense. [Citation.] Thus, people or entities are entitled to restitution when the crime was committed against them." (*Saint-Amans, supra*, 131 Cal.App.4th at p. 1086, citing *Birkett, supra*, at pp. 232, 233.)

In addition, our high court has defined "direct" as " ' "straightforward, uninterrupted, [or] immediate" in time, order or succession, or "proceeding [in logic] from antecedent to consequent, from cause to effect, etc., uninterrupted," or generally "[e]ffected or existing without intermediation or intervening agency; immediate." [Citation.] In legal contexts, "direct" similarly stands for . . . "proximate; by the shortest course; without circuitry; operating by an immediate connection or relation, instead of operating through a medium. . . ." [Citation.]' [Citation.]" (*People v. Slattery, supra*, 167 Cal.App.4th at pp. 1095–1096, citing *Birkett, supra*, 21 Cal.4th at p. 232, fn. 6.)

Applying these standards, California courts have rejected restitution orders made to entities indirectly affected by the crime for which the defendant was convicted. For example, in the seminal case of *Birkett*, our Supreme Court decided an insurance company that indemnifies the victim, its insured, against covered losses is not the direct victim of a defendant convicted of auto theft and operating a "chop shop." (*Birkett, supra*, 21 Cal.4th at pp. 229–230.) Likewise, a law enforcement entity that spends money to buy illegal drugs in undercover operations is not the direct victim of a defendant convicted of selling methamphetamine. (*People v. Torres* (1997) 59 Cal.App.4th 1.) A state department that pays for the toxic cleanup of methamphetamine labs is not the direct victim of a defendant convicted of methamphetamine manufacture. (*People v. Martinez, supra*, 36 Cal.4th 384.) A trade

12

association representing the United States recording industry is not a direct victim of a defendant convicted of selling counterfeit compact discs. (*People v. Kelly* (2010) 189 Cal.App.4th 73.) A hospital is not a direct victim entitled to restitution for a patient's unpaid medical bills from a defendant convicted of inflicting injury on an elder adult (the patient). (*People v. Slattery, supra*, 167 Cal.App.4th 1091.) A county animal services agency is not a direct victim entitled to restitution from a defendant convicted of animal cruelty and neglect. (*People v. Brunette*, *supra*, 194 Cal.App.4th 268.) And a homicide victim's estate is not a direct victim entitled to restitution from a defendant convicted of vehicular manslaughter. (*People v. Runyon* (2012) 54 Cal.4th 849.)

On the other hand, an insurance company *is* a direct victim entitled to restitution from a defendant convicted of insurance fraud. (*People v. O'Casey* (2001) 88 Cal.App.4th 967; *People v. Moloy* (2000) 84 Cal.App.4th 257.) Likewise, a county agency *is* a direct victim entitled to restitution when the defendant is convicted of welfare fraud. (*People v. Crow* (1993) 6 Cal.4th 952.) And a bank *is* a direct victim entitled to restitution for reimbursing a bank customer for fraudulent debits made from his account when the defendant is convicted of burglarizing the bank (*Saint-Amans, supra*, 131 Cal.App.4th 1076) or forging checks (*People v. Bartell* (2009) 170 Cal.App.4th 1258 [restitution ordered in a forgery case not filed pursuant to plea bargain]).

Here, defendant pleaded no contest to the charge that he did "unlawfully take money and personal property . . ., to wit . . . *electronic equipment* the property of Hilltop Apostolic Church." The only "electronic equipment" identified in the testimony was the machines Carol Powell leased from TimePayment Corporation. Although the factual basis for the plea stated defendant stole real and personal property and money "belonging to the church and to its members," neither the complaint nor factual basis statement named Carol Powell as a victim of defendant's crime, or the lease payments—as opposed to the leased equipment—as part of the church's loss.

13

According to the restitution request submitted on behalf of the church at the time of the original probation report, the church believed Ms. Powell had "donated" the ATM/credit card equipment to the church, and the church was requesting $11,413.03 for the amount she paid to lease them from TimePayment Corporation. They also viewed this money as a "[t]ithe/offering that belonged to the church." In her victim impact statement, Ms. Powell stated she *invested* "five years worth of advanced tithes" in a business "which Stark said would be for Hilltop Apostolic Church . . ., [but] which he . . . mismanaged for his own personal gain."

A revised restitution request submitted to the probation department on the church's behalf explained that Ms. Powell and defendant discussed becoming business partners in Jamestown Pure Water Company because defendant represented the business was to help the church. Ms. Powell decided against becoming a partner, but did "offer to pay the lease for banking equipment with what she called advanced tithes." However, the church never saw any proceeds from the business and it was not discussed with the congregation or the board of directors of the church. Ms. Powell discussed the transaction with her attorney, who advised her to get out of the deal, which she did by paying off the equipment to keep her credit from getting ruined and her good name from being mixed up with defendant.

Applying the logic and language of the foregoing cases to the facts at hand, we are not persuaded the church is the direct victim of the equipment lease payments made by Carol Powell, because the church was not the immediate object of defendant's fraud. Ms. Powell testified she agreed to help defendant lease the equipment for defendant's business because he said "all [the] money *that he would make from Jamestown Pure Water* would be to help pay for Hilltop Church." (Italics added.) To the extent defendant never intended the profits from his business to benefit the church, or converted the profits of his business to benefit himself, Ms. Powell was defrauded. To the extent defendant was merely a bad businessman, Ms. Powell turned out to have invested her money

14

unwisely. But the church was not the "immediate object" of the theft of lease payments. The lease payments were not made from money in the church's account. Nothing in the documentary evidence or testimony before the court suggested that at the time Ms. Powell entered into the lease agreement, the church itself was the intended donee of the equipment, or the beneficiary of redirected advance tithes. At most the church was indirectly affected by defendant's failure to turn over any profits from the water company to the church.

Here, the documentary evidence shows that Ms. Powell, doing business as Jamestown Pure Water, signed a "Non Cancellable Commercial Equipment Lease Agreement" for one Verifone Omni credit card terminal, one Verifone PIN pad and one Casio terminal. She identified herself as the "100% owner" of the business on the lease application and as "owner" on the agreement. She was the sole lessee and guarantor of the lease agreement. She authorized automatic debits from Jamestown Pure Water's business bank account. She signed the agreement on November 17, 2007, and TimePayment Corporation signed it on November 29, 2007.

According to the lease terms and conditions, which Ms. Powell initialed, "[t]he original Lease Term . . . commence[d] on the commencement date and expire[d] at the end of the number of months indicated on the front page," presumably the 48 months during which payments of $215 were due. At the end of the lease term, the lessee had the option of (1) promptly returning the equipment; or (2) extending the lease for the same terms and conditions on a month-to-month basis until such time as the lessee gave written notice of an election to terminate the lease; or (3) purchasing the equipment for the fair market value as quoted to the lessee by the company at that time, plus any applicable taxes.

In 2007, when she signed the lease agreement, Ms. Powell was not the church secretary or a member of the church's board of directors, and had no authority to enter into contracts on the church's behalf. Nor did the church's board authorize the contract.

15

It does not appear the church even knew about the contract at the time it was signed. Both Ms. Powell and defendant testified they were "cosignors" of the lease, although there is nothing in the documentary evidence to suggest defendant cosigned anything. Ms. Powell testified she gave the machine to defendant and told him it had to be paid off. When he remonstrated there was no way he or the church could pay her back, she said okay and let defendant take the machine back to his business.

Ms. Powell never testified she used advanced tithes to finance the equipment lease, or that she donated the machines to the church. By contrast, she did testify she donated 20 parcels of land to the church and "called it a tithe and ascribed it was for the church." The only evidence Ms. Powell intended the lease payments to be advanced tithes was the note she wrote to defendant, which stated: "Pastor, what if you wrote a check to me for advanced tithe, I sign it over as a personal loan to you, then I would just keep applying tithe and leave your paid back as in whatever tithe that is mine is your responsibility." However, in her testimony Ms. Powell specifically disavowed the letter. She testified it was "only a proposal but was never anything further than that. Instead, what happened was I signed as a cosignor for the ATM machine."

She testified she was not defendant's business partner and agreed to cosign the equipment lease because she "understood this was all to benefit the church" and "[t]hat all the money that he would make from Jamestown Pure Water would be to help pay for Hilltop Church." She apparently did not sign the lease with the intent to make the lease payments herself, because she testified she gave the machine to defendant and told *him* it had to be paid off. Even after he told her there was "no way" he or the church could pay her back, and after the machine was returned to her by the leasing company, she told defendant he could take the machine back to his business, albeit under false pretenses that he intended to use the profits from his business to benefit the church. Mrs. Powell ended up paying off the entire amount of $11,000 because she was "equally liable for the total amount and could not rescind the contract. This was a noncancellable contract."

16

The picture that emerges from the sum total of the evidence is that Ms. Powell signed the lease with the understanding that defendant would make the lease payments, and never thought she would have to pay them. She did so because she thought helping defendant's business would help the church. She paid off the lease only after realizing she was "equally liable for the total amount and could not rescind the contract" and would be sued if she did not pay.[7]

Since there is no credible evidence to support the view that Ms. Powell paid for the lease agreement with tithe money, or intended to donate the leased equipment to the church at the time of the lease agreement, we find the church was not a direct victim of the fraudulent lease agreement for which it was entitled to restitution of lease payments totaling over $11,000. We will therefore strike that portion of the restitution award.

## CONCLUSION

The church was not a direct victim of the fraudulent equipment lease within the meaning of section 1202.4. Ms. Powell, not the church, was the object of defendant's fraud. The church could not incur an economic loss as a result of the fraud on Ms. Powell because there was no credible evidence that (1) Powell used advance tithe money pay for the lease or (2) donated the equipment to the church at the time of the lease. To the extent the church suffered a loss from the equipment lease transaction, it was the indirect loss of profits from defendant's business. Ms. Powell did suffer a possible loss, but as she was not a victim of the crime for which defendant was convicted, she must rely on the civil law remedies available to her.

## DISPOSITION

The trial court's restitution order is modified to remove the award of $11,413.03 to the church for equipment lease payments made by Ms. Carol Powell. As modified, the restitution order is affirmed.

---

[7] Ms. Powell did not testify she consulted her attorney.

17

_____
DONDERO, J.


We concur:


_____
MARGULIES, Acting P. J.


_____
BANKE, J.


18

A141131