Filed 3/26/21  P. v. Camacho CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br>        Plaintiff and Respondent,<br>v.<br><br>SANTANA MARIELENA<br>CAMACHO,<br>        Defendant and Appellant. | A157651<br><br>(Contra Costa County<br> Super. Ct. No. 51814425) |

Defendant Santana Marielena Camacho appeals from her judgment of conviction for embezzlement, forgery and identity theft on two grounds:  first, that the trial court erred in ordering her to pay restitution to the victim company not only for the amount she embezzled, but also for IRS penalties the company incurred as a result of her failure to pay the company's federal payroll taxes and for related attorney fees, and, second, that her three-year period of probation should be reduced from three to two years based on the retroactive application of recently amended Penal Code section 1203.1, subdivision (a).  We agree with both arguments.  We reverse the restitution order to the extent it requires Camacho pay the victim company's federal payroll tax penalties and related attorney fees for lack of evidentiary support, and remand with the instruction that the trial court instead order that Camacho pay the company restitution totaling $28,737.60, the minimum amount the parties agree she should pay as a result of her embezzlement.

1

We also order that Camacho's period of probation be reduced to a term of two years.

## BACKGROUND

In August 2018, the Contra Costa County District Attorney filed an information charging Camacho with 10 felony counts for her alleged criminal misconduct between January 21, 2014, and August 31, 2015, while employed by Enchanted Planting, Inc., an Orinda, California landscaping company. Camacho was charged with one count of grand theft by embezzlement of money and personal property exceeding $950 in value in a consecutive 12-month period (Pen. Code, § 487, subd. (a)1)[1]; four counts of forgery exceeding $950 in value (§§ 470, subd. (d) and 473, subd. (a)); and five counts of identity theft (§ 530.5, subd. (a)).[2]

Camacho subsequently agreed to a negotiated disposition of the case. She pleaded no contest to all 10 felony counts and stipulated that she owed $28,948.09 in victim restitution to Enchanted Planting, with the understanding that the actual restitution amount she could be ordered to pay remained open. The court convicted her of the 10 counts, ordered her to serve 180 days in county jail (with the understanding that she would apply for electronic home detention), awarded her five days of custody and conduct credits and granted her formal probation for a period of three years. Among other things, the court also ordered her to pay a $300 restitution fine and reserved ruling on the amount of victim restitution she was to pay.

The court subsequently held a contested restitution hearing. The prosecution presented the testimony of Richard Sullivan, who co-owned

---

[1] Statutory references are to the Penal Code unless otherwise stated.

[2] For simplicity's sake, we will refer to Camacho's criminal conduct collectively as embezzlement.

2

Enchanted Planting with his wife, Shari Bashin-Sullivan. Sullivan said the company had employed about 20 people in 2014 and 2015, including Camacho, who, Sullivan said, was "hired to be a bookkeeper. So to look after the usual office tasks of . . . making payments to our vendors, to receive payments from our clients, and to take care of payroll, paying the employees their paychecks."

Sullivan testified that, as indicated in emails between him and Camacho when she was hired, her position was entitled "office assistant." Nonetheless, he said, Camacho was the one person at the company responsible for paying payroll taxes. The company paid its payroll taxes weekly online to the state and federal governments. Thus, "part of the process of doing the payroll is that you make those deposits, and it's usually done by direct deposit from our bank account into the government agency's bank account." Camacho was responsible for making these deposits.

Sullivan said that at some point in 2015, Camacho went on maternity leave. The company hired a new bookkeeper, which led to the discovery that Camacho was defrauding the company and diverting company funds illegally to herself, including through the company's payroll system. For example, it was discovered that a W-2 form had been sent to a former employee for a period when the company had not employed that person, and that Camacho had issued payroll checks in that person's name and diverted these funds via direct deposit to her own bank account. Camacho had also forged the signatures of Sullivan and his wife on unauthorized company checks payable to herself, these checks totaling $28,737.60. Defense counsel immediately stipulated to that "initial amount." The prosecution introduced through Sullivan an exhibit displaying forged checks and listing their amounts (with a total stated as $28,737.*76*).

According to Sullivan, the company also discovered Camacho had not paid payroll taxes to the federal government, and that as a result the company had incurred IRS penalties and fees. The prosecutor showed Sullivan an IRS document which lists five outstanding payments, from June 30, 2014, to June 30, 2015, totaling $308,674.17, including $193,910.69 in penalties. Sullivan confirmed Enchanted Planting had owed these amounts to the IRS for that time period, during which Camacho was responsible for the company's bookkeeping and payroll. Sullivan further testified, "we have no problem paying the tax, obviously, because we're liable for that. But the penalties and the assessments of fines, et cetera, was something that . . . our lawyer worked to get reduced by the IRS. As a result, the company had negotiated with the IRS to pay only $95,000 in penalties, not $193,910.69, and sought only that amount in penalties as restitution from Camacho.

Sullivan directly attributed this $95,000 of penalties to Camacho's criminal misconduct because, he said, "part of [Camacho's] task was to pay the payroll taxes. And if it was a case of simple oversight, or oh, I forgot to pay them this week, then she could have said, I didn't do this and I can do it next week. And then this problem would never have occurred. [¶] But this was over a period of over a year where no taxes were paid. It's completely to be expected that within her duties as—as a bookkeeper and responsible for payroll, that she would have paid the taxes." In his opinion, Camacho did not pay the taxes in order to divert funds to herself without the company noticing. He stated, in a sometimes confusing way that we will discuss further in the discussion section, that in his view, Camacho, by keeping a large amount of funds in the company's bank account, including what should have been paid to the IRS in payroll taxes, could obscure her diversion of a

4

significant amount of funds to herself. He said it would have been difficult to determine that the account contained excess funds because the company worked on a contracting basis with clients who owed or made sizeable payments at any given point in time, causing fluctuations in the amount of funds in the company's account.

Sullivan also said the company was seeking restitution for its attorney fees related to its IRS tax liability, which totaled $19,209.89. Thus, he said, the total amount of restitution that Enchanted Planting sought from Camacho was $142,946.49, which was comprised of the amount of company funds Camacho stole, the fines and fees the company owed the IRS as a result of Camacho's criminal misconduct, and the related attorney fees incurred by the company in dealing with the IRS.

The defense called as witnesses the co-owner of Enchanted Planting, Shari Bashin-Sullivan, and Camacho. Bashin-Sullivan testified she "was not really a person who was in the office," indicated Sullivan dealt with office matters, and did not recall talking with Camacho about preparing an office manual for her replacement around July 2015.

Camacho testified that Sullivan asked her to prepare a manual for the person who was "coming in to do bookkeeping" when Camacho went on maternity leave, which manual was admitted into evidence. The two-and-a-half-page document, entitled "Office Assistant Manual," lists a variety of responsibilities, including "Payroll," which was to be processed every Wednesday. It does not refer to payroll taxes.

Camacho said she was not a "trained accountant" or a "bookkeeper," but acknowledged that she had had some training in accounting and bookkeeping before working at Enchanted Planting, having taken QuickBooks online courses. She was responsible for preparing the company's

5

payroll but was not asked to do, and was not responsible for, payment of the company's payroll taxes. Sullivan "was responsible for signing all tax documentations." Camacho also testified, "It's against the law for somebody who is not legally the owner of the company to actually sign those documents. So it kind of makes sense why I wouldn't have done it my whole time being there."

Camacho admitted to diverting between $28,000 and $30,000 from Enchanted Planting to herself over more than a year and a half by writing herself payroll checks without the company knowing about it, and she said she was prepared to pay the restitution amount to which she had stipulated. She also said she did not steal any money that was meant for payroll or payroll taxes. She had access to the company's payroll funds and payroll checks, but it had been Sullivan's responsibility to pay taxes, including on the unauthorized payroll checks she wrote to herself without the company's knowledge. She also acknowledged that she embezzled funds from another company that she worked for after leaving Enchanted Planting.

In closing argument, the prosecutor argued that Camacho clearly was the person at Enchanted Planting who was responsible for payroll and that she employed an "extensive" embezzlement scheme that left the company's books in "total disarray." He further argued that her failure to pay taxes while she used the payroll system to embezzle funds indicated this failure was a part of her criminal conduct. He contended that Camacho, having been convicted of multiple felony offenses, lacked credibility and was blaming the victim for the damage she had caused.

Defense counsel acknowledged that Camacho had stolen about $28,000. He contended the prosecution was also "claiming unpaid taxes in the amount of $115,000 related to payroll tax. That is the total amount. $193,000 in

6

fines and fees; $308,000 total," and stated incorrectly that the remaining $115,000 had "now been negotiated down to $95,000"; in fact, as we have discussed, Sullivan's testimony indicated that it was the $193,000 in fines and fees that had been negotiated down to $93,000. Counsel continued on this incorrect line of contentions, stating, "There has been no testimony that she stole this $95- to $115,000 in payroll taxes that's mysteriously gone missing and mysterious[ly] unaccounted for." Therefore, the record did not show that Camacho was solely responsible for that money.

Defense counsel also argued that, regardless of Camacho's testimony, the prosecution had "not answered the question of where that $95,000 or $115,000 came from or where it is or who has it or where it went. So they're asking for money that Ms. Camacho does not have—" The court responded, "you and I do not know that, for one thing. They were able to prove a certain amount of money." It found that Camacho "testified very defensively, kind of purposely misunderstood a few of [the prosecutor's] questions, [and] did a little bit of double talk . . . ." Therefore, it was discrediting her testimony.

When defense counsel repeated his assertion that no one knew where the money was, the court stated, "I believe that it was Ms. Camacho's duties to pay the payroll taxes. She didn't pay the payroll taxes. I am not sure how her whole big scheme worked either this time or any other times, but I don't feel the need for the court to explain what happened with the payroll taxes. It was her responsibility and they weren't paid and I have no problem at all finding—attributing the $95,000 that was negotiated with the IRS to her actions because her only explanation is, Oh, it was Mr. Sullivan's doing. And somehow based on his testimony, I find that if it was Mr. Sullivan's responsibility to pay those, he would have paid them based on their demeanor and answers that came forth during the testimony." The court

7

ordered Camacho to pay a total of $142,947.49, which consisted of $28,737.60 of embezzled funds, $95,000 "in the IRS fines and penalties," and attorney fees of $19,209.89.

Camacho timely filed a notice of appeal from the sentence or matters occurring after the plea that did not affect the validity of the plea.

## DISCUSSION

## I.

### *The Court Erred in Ordering Camacho to Pay Enchanted Planting Restitution for Its IRS Penalties and Related Attorney Fees.*

Camacho argues on several grounds that the trial court erred when it ordered her to make restitution to Enchanted Planting for its IRS penalties and related attorney fees. We agree with one of her arguments: that there is not substantial evidence connecting these penalties and fees to her criminal conduct and, therefore, she should not have been ordered to pay them as restitution to the company.

Crime victims are entitled to restitution for losses suffered as a result of a criminal act. (Cal. Const., art. I, § 28, subd. (b).) "[V]ictim restitution is mandated by both the Constitution and section 1202.4." (*People v. Rowland* (1997) 51 Cal.App.4th 1745, 1751.) As summarized by one of many appellate courts, "[i]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims. (§ 1202.4, subd. (f).) The restitution order must be sufficient to fully reimburse the victim or victims for every determined economic loss incurred as a result of the defendant's criminal conduct, including, but not limited to, among other things, full or partial payment for the value of stolen or damaged property (§ 1202.4, subd. (f)(3)(A)), and actual and reasonable attorney's fees and other costs of

8

collection accrued by a private entity on behalf of a victim.  (§ 1202.4, subd. (f)(3)(H)).”  (*People v. Williams* (2010) 184 Cal.App.4th 142, 146.)

"At a victim restitution hearing, a prima facie case for restitution is made by the People based in part on a victim's testimony on, or other claim or statement of, the amount of his or her economic loss."  (*People v. Millard* (2009) 175 Cal.App.4th 7, 26.)  " 'Prima facie evidence' is defined as '[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced.' "  (*People v. Skiles* (2011) 51 Cal.4th 1178, 1186.)  " 'Once the victim has [i.e., the People have] made a prima facie showing of his or her loss, the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim.' " (*Millard*, at p. 26.)

" 'The standard of review of a restitution order is abuse of discretion. "A victim's restitution right is to be broadly and liberally construed." [Citation.]  " 'When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court.' "  [Citations.]' [Citation.]  However, a restitution order 'resting upon a " 'demonstrable error of law' " constitutes an abuse of the court's discretion.  [Citations.]' [Citation.]  'In reviewing the sufficiency of the evidence [to support a factual finding], the " 'power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the trial court's findings." [Citations.]  Further, the standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt. [Citation.]  "If the circumstances reasonably justify the [trial court's] findings," the judgment may not be overturned when the circumstances might also reasonably support a contrary finding.  [Citation.]  We do not

9

reweigh or reinterpret the evidence; rather, we determine whether there is sufficient evidence to support the inference drawn by the trier of fact. [Citation.]' " (*People v. Millard*, *supra*, 175 Cal.App.4th at p. 26.) Where the legal basis for a restitution award is under challenge, we conduct de novo or independent review. (*People v. Brunette* (2011) 194 Cal.App.4th 268, 277.)

Camacho makes several arguments in support of her claim that the court erred in ordering that she reimburse Enchanted Planting for the company's IRS penalties and related attorney fees. First, according to Camacho, the court's order violated her due process rights because it is not supported by substantial evidence and, therefore, "violates the due process and fair jury trial guarantees of the United States and California Constitutions, which require the prosecution to prove all elements of a crime beyond a reasonable doubt, and is therefore invalid." This is a frivolous argument, which misstates the burden of proof and references a right to a jury trial to which a defendant is not entitled at a restitution hearing.

Second, Camacho argues that she cannot be held responsible for Enchanted Planting's IRS penalties and related attorney fees because they resulted from an independent, superseding cause, that being Sullivan's failure to fulfill his non-delegable, legal responsibility to pay the federal payroll taxes. That this argument lacks merit is made clear by the only legal citation Camacho directly relies upon, *All Stacked Up Masonry, Inc. v. United States* (Oct. 22, 2020, No. 20-161T) 150 Fed. Cl. 540 [2020 U.S. Claims LEXIS 2073]. The case's holding dealt solely with a taxpayer's liability to the IRS, which is not at issue here. Nonetheless, the case acknowledges that "[a]s a matter of *business practice*, the taxpayer is, of course, free to retain or employ whomever it pleases to prepare taxes on its behalf." (*Id*. at p. *14.) That is precisely what Enchanted Planting did regarding Camacho.

10

Third, Camacho argues that the evidence shows she was not responsible for paying Enchanted Planting's federal payroll taxes and, therefore, she was not the cause of its IRS problems. She cites her own testimony at the restitution hearing that she was hired as an office assistant and not as a bookkeeper, and not responsible for paying the taxes, an assertion she contends is supported by the manual she prepared for her replacement, which does not refer to payroll taxes. The argument is likewise frivolous because Sullivan testified that she *was* responsible for paying the company's federal payroll taxes. We do not reweigh the evidence or second-guess the trial court's credibility determinations on substantial evidence review. (*People v. Maury* (2003) 30 Cal.4th 342, 403 ["it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends"]; *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [" 'we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder' "].)

Notwithstanding the lack of merit in most of Camacho's arguments, one aspect of her substantial evidence argument has merit. Sullivan's testimony is plainly substantial evidence that Camacho was responsible for paying the company's federal income taxes and repeatedly did not pay them for about a year, and that the company accrued IRS penalties and attorney fees as a result of this nonpayment. But this is the beginning and not the end of our inquiry. The question is whether the penalties and fees *were the result of* Camacho's *criminal* conduct. (*People v. Williams, supra*, 184 Cal.App.4th at p. 146.) In other words, the People had to present evidence connecting the actions that led to these penalties and fees, i.e.,

11

Camacho's repeated failure to pay the taxes, to her embezzlement. The People failed to meet this burden.

The People attempted to establish the connection through Sullivan's testimony that Camacho's failure to pay federal payroll taxes had left $115,000 more in the company's bank account than would have been in the account if she had paid the taxes. The prosecutor asked Sullivan, "[I]s it as though Ms. Camacho, based on what you had seen, this was a situation where a bookkeeper had merely forgotten to pay the taxes, or was the not paying of these taxes a way that she was able to divert funds to herself without the company noticing?" After the court overruled a defense objection that the question called for speculation and lacked foundation, Sullivan responded: "It seems to me that that was the case because clearly if—if she diverted the money for herself and there was no other source of it, we would have noticed that there's—perhaps, that there's no money in the account or why is—why is there—why is this money missing from the account? Whereas, if that other money then hadn't been paid to another vendor, for example, or in the case of the IRS to the IRS, then we didn't notice it because the money didn't disappear from the bank account to another place." Asked in cross-examination how he could "attribute 100-plus thousand dollars in missed payroll tax deductions to Ms. Camacho's fraudulent conduct," he said: "The *only reason I say that* is that she was the only person that would have been making the payroll taxes and payroll tax deposits." (Italics added.) After indicating the $115,000 of unpaid taxes were not discovered until the end of Camacho's employment, Sullivan seemed to doubt his own speculation: "So the difference—yes, *it looks odd* that she diverted $27,000 to herself and yet covered it up more than three times that by—by not paying payroll taxes. *Seems odd*." (Italics added.) He also indicated the company's bank account

12

balance constantly fluctuated based on the work done and client payments received, making it difficult to determine its finances at any given time, which testimony casts doubt on any contention that Camacho had to keep the tax money in the company's bank account to conceal her embezzlement.

Sullivan's testimony essentially infers from Camacho's failure to pay $115,000 in federal payroll taxes during the same time period that she embezzled about $28,000 from his company that she did not pay the taxes in order to hide her embezzlement. Substantial evidence includes all reasonable inferences that may be drawn from the evidence, and in reviewing the sufficiency of the evidence we draw all reasonable inferences in support of the judgment. (*People v. Annin* (2004) 117 Cal.App.4th 591, 600-601.) Not all inferences are reasonable, however. " 'A reasonable inference . . . "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work." ' " (*People v. Cluff* (2001) 87 Cal.App.4th 991, 1002.) "Suspicion is not evidence; it merely raises a possibility, and this is not a sufficient basis for an inference of fact." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) To infer that Camacho failed to pay the taxes in order to cover up her embezzlement merely because the two acts occurred during the same time period is not reasonable, as their coincidental timing reveals nothing about Camacho's motive or intent. (See, e.g., *Medipro Medical Staffing LLC v. Certified Nursing Registry, Inc.* (2021) 60 Cal.App.5th 622, 629 [inference that judgment debtors' collection-impeding slowdowns were due to nefarious conduct was "based on nothing but speculation" and thus was "not a *reasonable* inference"].) Sullivan's testimony linking the two is based on speculation, not substantial evidence that Camacho's failure to pay the taxes was connected to her embezzlement.

Sullivan's speculation aside, there is no evidence of Camacho's motive or intent in not paying the taxes. As Sullivan himself acknowledged, the disparity between the amount embezzled and the amount of taxes unpaid makes the supposition about her motive "odd." In short, while the evidence showed Camacho was derelict in her "bookkeeper" duties, it did not support a reasonable inference that this dereliction was connected to her crime.

For this reason, the trial court erred in ordering Camacho to pay Enchanted Planting the IRS penalties and related attorney fees as part of her restitution.[3]

## II.

### *Camacho's Period of Probation Must Be Reduced to Two Years.*

Camacho also argues that her period of probation should be reduced from three to two years via the retroactive application of section 1203.1, subdivision (a), as recently amended, under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*). The People oppose this claim, arguing that the Legislature did not intend section 1203.1, subdivision (a) to apply retroactively to cases such as Camacho's because her probation is not punishment in the *Estrada* context and because a blanket, automatic reduction of probation is not called for by the relevant statutory scheme. We agree with two recently published opinions on the subject and conclude that section 1203.1, subdivision (a), as amended, applies to Camacho's case, and order the reduction of her period of probation to two years.

---

[3] In the alternative, Camacho argues on two grounds that she should not pay the *full* amount of IRS penalties and related attorney fees, and seeks a remand for the trial court to determine the amount she should pay. We need not address these arguments in light of our conclusion that the prosecution did not show she was responsible for any of the IRS penalties and related attorney fees.

Camacho was placed on probation under a previous version of section 1203.1, which at the time authorized felony probation "for a period of time not exceeding the maximum possible term of the sentence" but where the "maximum possible term of the sentence is five years or less, then the period of suspension of imposition or execution of sentence may, in the discretion of the court, continue for not over five years." (Stats. 2010, ch. 178, § 75.) Assembly Bill No. 1950 (AB 1950) modified section 1203.1 to reduce felony probation terms to two years, with certain exceptions that do not apply here. Effective January 1, 2021, section 1203.1, subdivision (a) provides: "The court, or judge thereof, in the order granting probation, may suspend the imposing or the execution of the sentence and may direct that the suspension may continue for a period of time not exceeding two years, and upon those terms and conditions as it shall determine." (Stats. 2020, ch. 328, § 2.)

Two recent appellate decisions, by our colleagues in Division Four and by the Fourth Appellate District, addressed very similar issues to those raised by the parties here and reached the same conclusion: section 1203.1, subdivision (a) applies retroactively to probationers whose judgments are not final under the presumption of retroactivity established in *Estrada*.

In *People v. Quinn* (2021) 59 Cal.App.5th 874 (*Quinn*), our colleagues in Division Four considered whether AB 1950's amendment of section 1203.1, subdivision (a) applies retroactively to a defendant placed on probation for three years whose judgment was not yet final on January 1, 2021. (*Quinn*, at p. 879.) As the court pointed out at pages 881 to 882, our Supreme Court summarized the relevant law in *People v. Frahs* (2020) 9 Cal.5th 618, 627 to 628, as follows: " ' "[T]he Legislature can ordinarily enact laws that apply retroactively, either explicitly or by implication." [Citation.] Courts look to

15

the Legislature's intent in order to determine if a law is meant to apply retroactively. [Citation.] [¶] In [*Estrada*], we held that amendatory statutes that lessen the punishment for criminal conduct are ordinarily intended to apply retroactively. [Citation.] In endeavoring to ascertain the legislative intent in enacting such a statute, we found "one consideration of paramount importance." [Citation.] We explained: "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final. This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology." [Citation.] [¶] . . . "*Estrada* stands for the proposition that, 'where the amendatory statute mitigates punishment and there is no saving[s] clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed.' " [Citations.] If there is no express savings clause, the statute must demonstrate contrary indications of legislative intent " 'with sufficient clarity' " in order to rebut the *Estrada* rule.' "

The *Quinn* court rejected the People's argument that, much as the People argue here, probation is not punishment in the *Estrada* context. Citing several parts of AB 1950's legislative history, the court found that it "reflects that the Legislature's concern was that lengthy probationary periods

16

do not serve a rehabilitative function and unfairly lead to reincarceration for technical violations." (*Quinn, supra*, 59 Cal.App. 5th at p. 879.) The court also found persuasive the reasoning of *People v. Burton* (2020) 58 Cal.App.5th Supp. 1, which held that AB 1950's amendment of section 1203a (authorizing the grant of probation in misdemeanor cases) applied retroactively. The *Quinn* court concluded that in the *Estrada* context probation amounts to punishment, because, since "the Legislature has determined that the rehabilitative function of probation does not extend beyond two years, any additional period of probation can only be regarded as punitive, and therefore within the scope of *Estrada*." (*Quinn,* at p. 883.)

Similarly, in *People v. Sims* (2021) 59 Cal.App.5th 943 (*Sims*), the Fourth Appellate District concluded that a probationer is in constructive custody and, therefore, under restraint. "By limiting the maximum duration a probationer can be subject to such restraint, Assembly Bill No. 1950 has a direct and significant ameliorative benefit for at least some probationers who otherwise would be subject to additional months or years of potentially onerous and intrusive probation conditions." (*Sims*, at p. 959.) "There is no dispute that the longer a probationer remains on probation, the more likely it is he or she will be found to be in violation of a probation condition. There also is no dispute that the longer a probationer remains on probation, the more likely it is he or she will be sentenced to prison for a probation violation. Assembly Bill No. 1950 does not guarantee that a probationer will abide by his or her probation conditions and, as a result, avoid imprisonment. However, by limiting the duration of felony probation terms, Assembly Bill No. 1950 ensures that at least some probationers who otherwise would have been imprisoned for probation violations will remain violation free and avoid incarceration. Like the laws at issue in [*People v. Superior Court* ([*Lara*])

(2018) 4 Cal.5th 299,] and [*People v.*] *Frahs* [(2020) 9 Cal.5th 618], Assembly Bill No. 1950 thus ameliorates possible punishment for a class of persons—felony probationers." (*Id*. at p. 960.) Because the Legislature did not include a savings clause or otherwise indicate it intended the two-year limitation to apply only prospectively, the *Sims* court concluded that "the two-year limitation on felony probation set forth in Assembly Bill No. 1950 is an ameliorative change to the criminal law that is subject to the *Estrada* presumption of retroactivity" and, therefore, applies to cases where there is no final judgment as of the effective date of the amendment. (*Id*. at p. 964.)

The *Quinn* court also rejected an argument by the People that the Legislature intended AB 1950 to apply prospectively because it does not provide for automatic reduction of a period of probation since probationers can, under section 1203.3, seek early termination; in *Quinn*, the People based this argument on the reasoning of *People v. Conley* (2016) 63 Cal.4th 646, which held that a resentencing provision of the Three Strikes Reform Act of 2012 applied prospectively because, among other things, the Act included a new set of factors that disqualified defendants from automatic resentencing. (*Quinn*, *supra*, 59 Cal.App.5th at pp. 884-885.) The *Quinn* court noted that AB 1950 "does not create a mechanism by which probationers may petition for early termination. Penal Code section 1203.3 already existed. While that procedure may prove beneficial to a probationer whose case is already final, it does not support an inference of legislative intent with respect to a probationer whose sentence is not yet final . . . [and] reflects a categorical determination that a shorter term of probation is sufficient for the purpose of rehabilitation. . . . There is no indication in the legislative history that the Legislature was concerned with disruptions to probationary proceedings already in progress." (*Quinn*, at pp. 884-885, fn. omitted.)

18

The People essentially repeat this argument here, also relying on the early termination provision contained in section 1203.3.[4] We reject it based on *Quinn*.

In summary, we follow *Quinn* and *Sims* and conclude that in the *Estrada* context the probation provided for in section 1203.1, subdivision (a) is punishment, that AB 1950 is an ameliorative change to the criminal law, and that section 1203.1, subdivision (a) is, therefore, subject to the *Estrada* presumption of retroactivity. Accordingly, as did the *Quinn* court, we shall reduce the term of Camacho's probation to two years. (See *Quinn*, *supra*, 59 Cal.App.5th at p. 885.)

## DISPOSITION

We reverse the restitution order to the extent it requires Camacho pay the victim company's federal payroll tax penalties and related attorney fees for lack of evidentiary support, and remand with the instruction that the trial court instead order that Camacho pay the company restitution totaling $28,737.60. Camacho's probation is reduced to a term of two years.

---

[4] The People also refer to section 1203.4, which does have an early termination provision. This appears to be a typographical error.

19

_____

STEWART, J.

We concur.

_____

RICHMAN, Acting P.J.

_____

MILLER, J.

*People v. Camacho* (A157651)

20