Filed 3/29/24  In re M.M. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.M., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | E081571 |
| Plaintiff and Respondent, | (Super.Ct.No. J291182) |
| v. | OPINION |
| M.M.., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Charles J. Umeda, Judge.  Affirmed.

Pauline E. Villanueva, under appointment by the Court of Appeal, for Defendant and Appellant.

Pacific Juvenile Defender Center and Jonathan Grossman as Amicus Curiae on behalf of Defendant and Appellant.

1

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Maxine Hart, Deputy Attorneys General, for Plaintiff and Respondent.

## I.  INTRODUCTION

On December 10, 2021, a juvenile wardship petition was filed alleging that M.M. committed murder in violation of Penal Code section 187, subdivision (a).  M.M. appeals from an order made pursuant to Welfare and Institutions Code[1] section 707, transferring jurisdiction of his case to a court of criminal jurisdiction.  According to M.M., the juvenile court's transfer order must be reversed because:  (1) the juvenile court applied the wrong legal standard when evaluating whether transfer was appropriate, and (2) substantial evidence does not support the juvenile court's factual finding that M.M. is not amenable to rehabilitation while under the jurisdiction of the juvenile court.  We disagree with both contentions and affirm the order.

## II.  BACKGROUND

*A.  Facts and Procedural History*

On October 7, 2021, police officers responded to a reported shooting and discovered a man on the sidewalk with a single gunshot wound to the back.  The man later died from his injury after being transported to a nearby hospital.  As a result of this incident, a juvenile wardship petition was filed alleging that M.M. committed murder in violation of Penal Code section 187, subdivision (a), as the result of an incident that

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

occurred on October 7. While M.M. was 17 years of age at the time of the alleged offense, the People requested a hearing to determine whether the case should be transferred to a court of criminal jurisdiction pursuant to section 707. After receiving evidence and live testimony on the petition, the juvenile court granted the request to transfer jurisdiction of M.M.'s case to the criminal court.

*B. Relevant Evidence*

    1. <u>Testimony of Investigating Police Officer</u>

A police officer testified that he was assigned to investigate a shooting that occurred on October 7, 2021. While at the scene of the shooting, the officer observed bullet holes that indicated a firearm had been discharged into the rear-passenger side of a vehicle, as well as into nearby occupied apartments. According to the officer, the area where the shooting occurred was known to be within the territory of a street gang known as North Side Locz. The officer later obtained surveillance video depicting the shooting and identified M.M. as one of the individuals who committed the shooting.

The officer testified that he also obtained four videos that had been posted on M.M.'s social media account within hours of the shooting. One video depicted M.M. wielding a firearm, displaying live ammunition loaded into the firearm, and smiling and dancing while describing how he felt when discharging the firearm. In a second video, M.M. is depicted handling ammunition; loading ammunition into a firearm magazine; and making statements that the officer interpreted as a slang reference to a shooting. The officer also obtained multiple photographs posted to M.M.'s social media account that depicted M.M. wielding an assault rifle style firearm, displaying gang-related hand signs,

3

and wearing distinctive clothing similar to that worn by one of the suspects depicted in the surveillance video of the murder.

2. Testimony of M.M.'s Probation Officer

M.M.'s probation officer testified that M.M. had previously been arrested for another offense. The prior arrest was for possession of an assault rifle and occurred while M.M. was in the company of members of a street gang known as the 10th Street Mellow Mafia Bloods gang. As a result of this arrest, M.M. pled guilty to the possession of an assault weapon. The probation officer testified that the firearm involved in the prior offense and the one involved in the current offense were both "ghost" guns, which had no serial numbers. Additionally, the firearm used in the current offense had been modified to enhance aim; had been modified with illegal features that enhanced its lethal potential; and utilized ammunition that was powerful enough to penetrate through walls, panels, and cars.

The probation officer testified that he made a written report recommending that M.M. be transferred to the jurisdiction of the criminal court. According to the report, M.M. was in the 11th grade at the time of the murder; was enrolled in special education classes; and had previously been suspended several times for violent behavior in school. The probation officer expressed the opinion that all five of the statutory criteria for transfer weighed in favor of transferring M.M. to criminal court and explained the basis for his beliefs during his testimony.

The probation officer acknowledged that, after M.M.'s arrest for murder, M.M. had successfully completed high school and was taking college courses; displayed

4

periods of exceptionally good behavior while detained in juvenile hall; and actively participated in a variety of rehabilitative classes and services. However, the officer testified that there were also incidents that suggested M.M. had not abandoned his prior gang affiliations and was prone to revert back to violent behavior. The probation officer testified that, in his experience, many juveniles facing serious charges such as murder do well in structured environments, such as juvenile hall; but, they were unable to successfully rehabilitate once removed from a structured environment.

   3. Testimony of Supervising Probation Officer

A supervising probation officer assigned to the county's secure youth treatment facility testified that she conducted an initial screening to determine if M.M. was a suitable candidate for treatment in the facility's program, known as "ARISE." Candidates accepted into the program are offered numerous counseling, therapy, and educational services to further assist with rehabilitation. The supervising probation officer determined that M.M. was not a suitable candidate for the "ARISE" program.

The supervising probation officer explained that the initial screening involved review of the facts of an alleged offense to evaluate the degree of a youth's participation and role; review of the level of sophistication displayed by the youth in the commission of the offense; consideration of the youth's attitudes toward treatment; and consideration of the youth's history of delinquency. She explained that a youth's history regarding past trauma, mental health struggles, or substance abuse would not impact her opinion regarding suitability. This is because the "ARISE" program is specifically "geared toward the adolescent mind," and, as a result, youth who are deemed to have progressed

5

beyond that level of maturity are not suitable.  Because the youth's past history of trauma, mental health struggles, or substance abuse does not change the youth's present circumstance, it would not meaningfully impact suitability.

    4. <u>Testimony of Social Worker</u>

A social worker with the San Bernardino Public Defender's Office testified on M.M.'s behalf.  The social worker conducted a biopsychosocial assessment of M.M. and concluded that M.M. struggled to stay focused and displayed behavioral issues while in school, suggesting possible developmental and educational delays.  The social worker reported that M.M.'s great-grandmother became his legal guardian when he was 8 years of age; M.M. had only sporadic contact with his mother; and M.M. had little or no contact with his father.  The social worker opined that the absence of a father figure can cause emotional turmoil, including feelings of anger, resentment, and anxiety.

The social worker reported that M.M. had suffered from childhood trauma, noting that M.M. had experienced multiple deaths in the family as a child and witnessed the negative effects of substance abuse on family members.  She opined that the effects of trauma on children can often manifest differently than in adults.  Experiencing violence in the community can cause youth to become desensitized to violence, fearful or hypervigilant, and motivate them to find ways to cope and adapt to their environment.  However, the social worker stated that her general assessment did not include consideration of the circumstances of the alleged offense or the degree of M.M.'s involvement in the offense.

5.  Testimony of Clinical Psychologist

A Department of Corrections clinical psychologist also testified on M.M.'s behalf. The psychologist met with M.M. on two occasions, interviewed M.M.'s mother, and reviewed records from M.M.'s history in the dependency system. She opined that M.M. experienced a "significant" amount of trauma during his childhood and, as a result, displayed symptoms related to depression, grief, and loss. She diagnosed M.M. with post-traumatic stress disorder, conduct disorder, childhood onset type, cannabis-use disorder, alcohol-use disorder, and borderline intellectual functioning. In her opinion, M.M. did not have the developmental or intellectual capacity of an 18-year-old person. She also did not believe that M.M. had received sufficient treatment to address any of his identified mental health disorders.

The psychologist considered the statutory factors related to the transfer of jurisdiction, but she did not believe that they were sufficient to warrant the transfer of M.M. Specifically, she explained that M.M.'s degree of sophistication was questionable in light of his identified mental health disorders, which made him vulnerable to anti-social or negative peer influence that might induce him to engage in risky behaviors. She also expressed the opinion that M.M. could be rehabilitated if maintained in a structured environment and given the necessary services and treatment offered in the "ARISE" program.

The psychologist acknowledged that M.M. had a history of delinquent behavior and did not successfully rehabilitate following two prior grants of probation. However, she believed these factors should be given little weight because, in her opinion, the

7

juvenile system had not provided M.M. with the correct treatment to adequately address his mental health issues, such that he could have successfully rehabilitated during his prior terms of probation.

6. Testimony of M.M.'s mother

M.M.'s mother testified that M.M. went through significant traumatic experiences as a child, including: (1) a close friend being shot and killed in 2020; (2) a brother being shot twice and experiencing an overdose on one occasion; and (3) being bullied as a child. While M.M.'s mother claimed to know all of M.M.'s close associates, she later admitted she could not identify individuals depicted in M.M.'s social media posts. She also admitted that she had never seen the social media photographs depicting M.M. wielding firearms and ammunition. She recalled that M.M. had two tattoos, but she did not believe either depicted symbols suggesting a relationship with a gang.

7. Juvenile Record

The juvenile court took judicial notice of the sealed records from M.M.'s prior juvenile adjudications. M.M. previously admitted to committing felony grand theft and misdemeanor battery for an incident that occurred when he was 14 years of age. As a result, M.M. had been placed on summary probation, and the case was dismissed after M.M. completed multiple rehabilitative courses and successfully completed probation.

In June 2020, M.M. admitted to committing a felony assault by means of force likely to cause great bodily injury and was again placed on formal probation. He again successfully completed probation after taking multiple rehabilitative classes. The murder

alleged in this case occurred only months after M.M. successfully completed probation for the felony assault.

## III. DISCUSSION

On appeal, M.M. asserts two bases for reversal of the juvenile court's order transferring his case to the jurisdiction of the criminal court: (1) the juvenile court erred by failing to apply a new "super factor" in determining whether transfer was appropriate under the amended version of section 707, and (2) the juvenile court's factual finding that M.M. was not amenable to rehabilitation while under the jurisdiction of the juvenile court was not supported by substantial evidence. We disagree with both contentions and affirm the order.

### A. General Legal Principles and Standard of Review

"In any case in which a minor is alleged to be [a ward of the juvenile court] by reason of the violation, when the minor was 16 years of age or older, of any . . . felony criminal statute, the district attorney . . . may make a motion to transfer the minor from juvenile court to a court of criminal jurisdiction. (§ 707, subd. (a)(1).) "In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3).) In making this determination, the juvenile court is required to consider five, statutorily specified criteria: (1) "[t]he degree of criminal sophistication exhibited by the minor"; (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction"; (3) "[t]he minor's previous delinquent history"; (4) the "[s]uccess of previous attempts by

the juvenile court to rehabilitate the minor"; and (5) "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor." (§ 707, subd. (a)(3)(A)-(E).)

The juvenile court's decision to transfer a minor to the jurisdiction of the criminal court pursuant to section 707 is reviewed for abuse of discretion. (*People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 680 ["[T]he trial court's ultimate finding of fitness or unfitness remains subject to review for error under an abuse of discretion standard."]; *D.C. v. Superior Court* (2021) 71 Cal.App.5th 441, 451.) However, "[t]he abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious. (*People v. Thai* (2023) 90 Cal.App.5th 427, 433; *People v. Pomar* (2023) 95 Cal.App.5th 504, 514.) "A trial court abuses its discretion when its factual findings are not supported by the evidence, or its decision is based on an incorrect legal standard." (*Thai*, at p. 433.)

*B. The Juvenile Court Did Not Apply an Incorrect Legal Standard*

Initially, we address M.M.'s argument that the juvenile court abused its discretion by applying an incorrect legal standard. M.M. concedes that the juvenile court expressly considered each of the statutorily enumerated factors when making its decision. However, M.M. contends that the Legislature's most recent amendments to section 707 created a new, independently dispositive "super factor" that required the juvenile court to

make a separate determination regarding whether M.M. was amenable to rehabilitation, regardless of its findings related to the five statutorily enumerated factors.

Because this claim involves a question of statutory interpretation, we independently review this aspect of the trial court's otherwise discretionary decision. (*People v. Brunette* (2011) 194 Cal.App.4th 268, 276 ["[A]n appellate court's consideration of a claim that a trial court abused its discretion . . . because the lower court applied an incorrect legal standard is tantamount to independent or de novo review."]; *Barron v. Stanta Clara County Valley Transportation Authority* (2023) 97 Cal.App.5th 1115, 1123 [Under review for abuse of discretion, "proper interpretation of statutes and court rules are issues of law, and in such instances we review the trial court's decision de novo."].) Nevertheless, we disagree with M.M.'s proffered interpretation of the amendments to section 707 and conclude that the record does not show the juvenile court applied an incorrect legal standard in this case.

"Effective January 1, 2023, the Legislature amended section 707, adding the following language: 'In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' [Citation.] This changed the finding a juvenile court must make before ordering a transfer in two ways: (1) raising the standard of proof and (2) requiring a new specific finding regarding amenability to rehabilitation." (*In re S.S.* (2023) 89 Cal.App.5th 1277, 1284.) In our view, the plain meaning of the words used in the amended statute do not support M.M.'s proffered interpretation of the statute.

11

While section 707 now specifies that the juvenile court is to make an ultimate finding that "the minor is not amenable to rehabilitation," the very next sentence instructs that: "In making its decision, the court shall consider the criteria specified in subparagraphs (A) to (E) . . . ." (§ 707, subd. (a)(3).) Thus, the language of the statute is clear and unambiguous that the juvenile court's finding that a minor is not amenable to rehabilitation should be based upon an evaluation of the five statutory criteria. Put differently, the requirement that the juvenile court make an ultimate finding that a minor is not amenable to rehabilitation is not an independent factual finding intended to supplant the other statutorily enumerated factors. Instead, the five statutory factors are the means by which the juvenile court is to reach the ultimate determination of whether a minor is amenable to rehabilitation.

We are not alone in reaching this conclusion. We observe that, to date, the published decisions that have considered the argument posed by M.M. have concluded that the five statutory factors set forth in section 707 are intended to inform the juvenile court's ultimate determination on the question of amenability to rehabilitation. In *In re S.S.*, *supra*, 89 Cal.App.5th 1277, the Court of Appeal explained that section 707 now "makes 'amenab[ility] to rehabilitation' the ultimate determination"; the amended statute requires that "[t]he analysis of the five criteria set forth in the statute should be focused through the lens of amenability to rehabilitation" (*In re S.S.*, at p. 1288); and the juvenile court is required "to consider each of the five statutory criteria and how those criteria affect minor's amenability to rehabilitation while under the jurisdiction of the juvenile court" (*id.* at p. 1294). Likewise, in *In re E.P.* (2023) 89 Cal.App.5th 409, the Court of

12

Appeal concluded that: "The amended section 707 requires the juvenile court to consider all five factors together in determining whether the minor is amenable to rehabilitation. Under the amended statute, like the previous version, the court has the discretion to conclude that one or more of the five factors predominate so as to determine the result, even though some or all of the other factors might point to a different result." (*In re E.P.*, at p. 417.) M.M. has not directed our attention to any published decision that has concluded that the amendments to section 707 constitute the creation of a new "super factor" to be determined separately from the statutorily enumerated factors.[2]

We are also unpersuaded by M.M.'s argument that Rules of Court, rule 5.770(b), supports his argument that section 707 now creates a new, independent "super factor" for the juvenile court's consideration. Rule 5.770(b) expressly provides that the juvenile court may order transfer "if the court finds by clear and convincing evidence each of the following: [¶] (1) the youth was 16 years or older at the time of any alleged offense . . . ; [¶] (2) The youth should be transferred to the jurisdiction of the criminal court based on an evaluation of all the criteria in [section 707, subdivision (a)(3)]; and (3) The youth is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (Rules of Court, rule 5.770(b).) Thus, by its very terms, the rule mandates an evaluation of the five statutory criteria set forth in section 707 as part of the juvenile court's determination

---

[2] M.M.'s reliance on *H. v. Superior Court* (1970) 3 Cal.3d 709; *People v. Chi Ko Wong* (1976) 18 Cal.3d 698; and *J.N. v. Superior Court* (2018) 23 Cal.App.5th 706 are unavailing. Each of these cases predate the amended version of section 707 now in effect. Accordingly, these cases are not persuasive when compared to published decisions that have actually addressed the proper interpretation of the amended version of the statute.

on a motion to transfer. Interpreting this rule to permit the juvenile court to make a transfer determination regardless of how the statutory factors are weighed would render portions of the statute and relevant rule of court superfluous, instead of harmonizing the provisions to give each provision relevance in the statutory scheme. (*People v. Fouse* (2024) 98 Cal.App.5th 1131, 1145 [" ' "We must harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole.' " ' "]; *Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476 [" 'When two statutes touch upon a common subject,' we must construe them 'in reference to each other, so as to "harmonize the two in such a way that no part of either becomes surplusage." ' "].)

Thus, we disagree with M.M. that recent amendments made to section 707 create a new, separate, and dispositive "super factor" for the juvenile court's consideration. While we agree with the general proposition that the juvenile court's decision should be based upon an ultimate determination that the minor is not amenable to rehabilitation, the five statutory factors are intended to be the means by which the juvenile court is to make this ultimate determination. (*In re Miguel R.* (Mar. 1, 2024, E082250) ___Cal.App.5th___[2024 Cal.App.Lexis 141].) As we explained in *In re Miguel R.*, under section 707, the juvenile court is to consider each of the five statutory factors; determine the extent to which each factor suggests the minor may be amenable to rehabilitation; and weigh the factors in order to make an ultimate determination of whether, collectively, the factors show the minor is amenable to rehabilitation. (*Ibid.*) The record in this case shows the trial court followed that exact process when it expressly

14

found that the last three factors "weig[h] heavily in support to find that the youth is not amenable to rehabilitation within the jurisdiction of the juvenile court." This was a correct understanding and application of section 707, and we find no basis to conclude that the juvenile court abused its discretion by failing to consider amenability to rehabilitation as a separate and independent "super factor."[3]

## C. *The Juvenile Court's Factual Findings Are Supported by Substantial Evidence*

Alternatively, M.M. argues that the juvenile court abused its discretion because its factual findings with respect to each of the statutory factors was not supported by substantial evidence. In this case, the juvenile court made an express finding that M.M. was not amenable to rehabilitation while under the jurisdiction of the juvenile court based upon three statutory factors: (1) the minor's previous delinquent history (§ 707, subd. (a)(3)(C)); (2) the lack of success of previous attempts by the juvenile court to rehabilitate the minor (§ 707, subd. (a)(3)(D)); and (3) the circumstances and gravity of the offense alleged in the petition to have been committed by the minor (§ 707, subd. (a)(3)(E)). We conclude that the juvenile court's findings with respect to each of these factors is supported by substantial evidence.

---

[3] Further, even assuming the statute now creates a "super factor" that overcomes all the other statutory factors, we fail to see how M.M. could have been prejudiced under the facts of this case. The juvenile court concluded the transfer hearing by making the ultimate finding that "the People have met their burden to show that the youth is not amenable to rehabilitation within the jurisdiction of the juvenile court, and the youth should be transferred to the jurisdiction of the criminal court." Thus, even assuming that this represented a super factor that could overcome the other statutory factors, the trial court made a specific, factual finding against M.M. on this very issue and, as a result, M.M. could not have suffered any prejudice.

15

First, the evidence of M.M.'s previous delinquent history was undisputed. M.M. had previously admitted to grand theft from the person (Pen. Code, § 487, subd. (c)); misdemeanor battery (Pen. Code, § 242); assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)); and possession of an assault weapon (Pen. Code, § 3605). As the juvenile court observed, two of the prior incidents involved violent behavior and infliction of physical injury on the victim, and the subsequent possession of a lethal weapon and commission of a murder represents a pattern of escalating violent behavior. This was substantial evidence upon which the juvenile court could rely to reasonably conclude that M.M.'s previous delinquent history weighed in favor of finding that he was not amenable to rehabilitation within the juvenile court.

On appeal, M.M. does not dispute the evidence of his delinquent history and does not argue that the juvenile court drew an unreasonable inference based upon this evidence. Instead, M.M. directs our attention to other evidence offered to show that M.M.'s behavior was impacted by childhood trauma. It is true that M.M. presented the testimony of a social worker and a clinical psychologist, who both offered the opinion that M.M. had suffered from significant childhood trauma. However, on review for substantial evidence, "[w]e neither reweigh the evidence nor reevaluate the credibility of witnesses." (*People v. Jennings* (2010) 50 Cal.4th 616, 638; *People v. Nelson* (2011) 51 Cal.4th 198, 210; *People v. Gaines* (2023) 93 Cal.App.5th 91, 110.) Notably, both the social worker and clinical psychologist identified M.M. and M.M.'s mother as the source of the foundational facts upon which they based their opinions. The trial court had the opportunity to hear directly from M.M.'s mother, who was called to testify to these

foundational facts and subject to cross-examination. Ultimately, the trial court concluded that the reports of childhood trauma were entitled to little weight because the evidence of trauma consisted of largely self-reported incidents.

Having heard directly from a key percipient witness to the foundational facts upon which M.M.'s experts subsequently relied to form his opinions, the trial court was in the best position to assess the credibility of the witness in order to determine the appropriate weight to be given any expert opinion based upon these foundational facts. It is not our role on appeal to reexamine these credibility determinations. M.M. does not meet his burden to show a lack of substantial evidence by pointing to conflicting evidence in the record and suggesting that this court reweigh or reassess the credibility of witness testimony in order to draw a different inference in his favor on appeal.

Second, the evidence of unsuccessful previous attempts by the juvenile court to rehabilitate M.M. was also undisputed. As the juvenile court observed, M.M. had previously successfully completed two separate terms of probation, lasting six months and one year, respectively. M.M. was also required to complete anger management, victim awareness, and substance abuse classes as part of the terms of his probation. Despite this, M.M. was arrested for possession of a firearm and murder. Notably, the murder occurred only months after his completion of probation for a prior offense. This was substantial evidence upon which the juvenile court could rely to conclude that prior attempts by the juvenile court to rehabilitate M.M. were unsuccessful.

On appeal, M.M. directs our attention to testimony by the clinical psychologist, who opined that the rehabilitative services provided to M.M. were insufficient because

17

they "were just scratching the surface" and would not be able to get "to the root of what his actual issue is." However, [s]ubstantial evidence does not mean evidence free of ambiguities or inconsistencies. . . . A 'defendant does not defeat the sufficiency of the evidence merely by offering "competing inferences he wishes the jury had drawn" ' [citation]; and '[t]he existence of possible exculpatory explanations, whether they are simply suggestions not excluded by the evidence or even where they could be reasonably deduced from the evidence, could not justify [a reviewing court's] rejecting the determination of the trier of fact . . . .' " (*People v. Tice* (2023) 89 Cal.App.5th 246, 256-257; *People v. Kopp* (2019) 38 Cal.App.5th 47, 74 [Upon review for substantial evidence, when more than one inference "can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of [the trier of fact]."].)

Here, we observe that the testimony of the clinical psychologist actually gives rise to two, competing inferences. One reasonable inference is that M.M. was not provided the correct services during prior periods of probation and, as a result, little weight should be given to otherwise undisputed evidence that prior attempts had been unsuccessful in rehabilitating M.M. But an equally reasonable inference is that prior services were inadequate because the services necessary to rehabilitate M.M. were simply not available in the juvenile system. Indeed, other evidence in the record supported this second inference. While the clinical psychologist testified that she believed the "ARISE" program could "benefit" M.M., she also acknowledged that M.M. suffered from intellectual limitations that would impede his ability to successfully complete the program. Similarly, the supervising probation officer regularly charged with screening

18

youth for the "ARISE" program testified that M.M. was screened but was not a suitable candidate. Taken together, this was substantial evidence upon which the juvenile court could rely to conclude that the services necessary to successfully rehabilitate M.M. were simply not available in the juvenile system. The fact that the juvenile court could have reached a different conclusion if it disregarded some evidence and credited other evidence more favorably to M.M. does not establish a lack of substantial evidence.

Third, the evidence regarding the circumstances and gravity of the current offense was undisputed. With respect to the murder, the evidence showed that M.M. used a firearm specifically modified to increase its lethality, and that he discharged the firearm multiple times in the direction of the victim, striking a vehicle as well as entering an occupied residence. Additionally, M.M. posted multiple videos and photographs on social media within hours of the shooting, suggesting he had no remorse for his actions. (see *D.C. v. Superior Court* (2021) 71 Cal.App.5th 441, 457-458 ["Expressive writings, while generally not evidence of their literal truth, may well be evidence of the writer's mental and emotional state" and can be considered as evidence of a juvenile's "continued attraction to violence"]; RT 1234-1237) In fact, one of M.M.'s own experts admitted that the circumstances of the current offense were "pretty significant and serious"; "show[ed] a blatant disregard to the rights of others and, also, a grave callousness to an individual's life"; and that research shows "that such characteristics are difficult to rehabilitate." All of this constituted substantial evidence upon which the juvenile court could rely to conclude that the circumstances and gravity of the offense weighed in favor of finding that M.M. was not amenable to rehabilitation within the jurisdiction of the juvenile court.

Finally, we address M.M.'s argument regarding the sufficiency of the evidence with respect to whether M.M. could be rehabilitated prior to the expiration of the juvenile court's jurisdiction. While the juvenile court found this factor to be "neutral" and did not rely on this factor in determining that M.M. was not amenable to rehabilitation, M.M. suggests on appeal that the juvenile court should have considered this factor as one that weighed in favor of retention. However, M.M.'s own expert acknowledged that she could not put a time line on when M.M. could be expected to rehabilitate[4] and, at one point, even conceded that M.M. might have difficulty completing the services that could potentially be offered in juvenile jurisdiction. Given this testimony, the juvenile court could reasonably find that there was simply insufficient evidence to make a finding as to whether there was sufficient time for M.M. to rehabilitate prior to the expiration of juvenile court jurisdiction. Thus, substantial evidence supports the juvenile court's determination that this factor was neutral and did not weigh in favor of either transfer or retention.

Upon review of the record, we conclude that substantial evidence supports the juvenile court's factual findings that three of the five statutory factors suggested M.M. was not amenable to rehabilitation within the jurisdiction of the juvenile court. Because the juvenile court's careful review of the statutory factors and the applicable evidence as to each support its ultimate finding that M.M. was not amenable to rehabilitation, we

---

[4] Specifically, the clinical psychologist testified that "[t]he time frame is yet to be determined," and "[i]t really would just depend on how well he performs in treatment . . . ."

20

cannot conclude that the juvenile court's decision to order a transfer constituted an abuse of discretion.

## IV.  DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____

J.

We concur:


McKINSTER _____

      Acting P. J.


CODRINGTON _____

        J.